**Appeal of George R. LAURE and Esther L. Laure.**

**W–L MOLDING COMPANY, Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

Nos. 79–1231, 79–1232.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 9, 1980.

Decided June 26, 1981.

Rehearing Denied September 3, 1981.

254

D. Alden Newland, Honolulu, Hawaii, for petitioners-appellants.

M. Carr Ferguson, Asst. Atty. Gen., Jonathan S. Cohen, Gilbert E. Andrews, Wynette Hewett, Tax Division, U. S. Dept. of Justice, Stuart E. Seigel, Chief Counsel, Internal Revenue Service, Washington, D. C., for respondent-appellee.

Before ENGEL, MERRITT and KENNEDY, Circuit Judges.

ENGEL, Circuit Judge.

Taxpayers appeal a decision of the Tax Court reported at 70 T.C. 1087 (1978). W–L

Molding Company (W–L) appeals the Tax Court's decision that its merger with Lakala Aviation, Inc. (Lakala), with which it stood in a brother-sister corporation relationship was not a valid reorganization under I.R.C. § 368(a)(1)(A) because the merger lacked a business purpose and continuity of business enterprise. George R. Laure, the sole shareholder of W–L and of Lakala before the merger, appeals the Tax Court's decision that he received a $68,712.01 constructive dividend through W–L's post-merger repayment of Lakala's debt in that amount to him. Laure also appeals the Tax Court's decision upholding the assessment of constructive dividends to him in the amount of $14,947.93 in 1971 and $5,247.56 in 1972 under the Commissioner's income and deduction reallocation powers granted by I.R.C. § 482. We affirm in part, reverse in part and remand for further proceedings.

## I.

W–L is engaged in the plastic manufacturing business. Since the early years of its existence, W–L has relied heavily upon air transportation to service the needs of its customers quickly and frequently by flying engineers and deliveries to them when needed. The record strongly supports W–L's claim that this use of air transportation contributed in great measure to its success over the years.

Although W–L originally owned its own plane, it eventually needed the services of a reliable air charter service to provide additional transportation. Unable to find an air charter service reliably available in the Kalamazoo area, Laure incorporated Lakala in 1958 to provide this service. Lakala was separately incorporated at the suggestion of W–L's bank to avoid exposure of W–L's more substantial assets to liability from potential air disasters.

Lakala later entered into a base operation lease with the Kalamazoo Airport to increase its profitability. As a base operator, Lakala chartered air service, serviced and maintained airplanes and sold aviation fuel and parts. Lakala later became a dealer for an aircraft manufacturer. In 1962, La-

kala began to perform light manufacturing with machine tools it had purchased from W–L. It also performed certain mold inspection work for W–L.

Lakala was generally profitable until 1968. In three of the next four years, however, it lost money. To keep Lakala afloat during 1969, 1971 and 1972, both W–L and Laure, individually, loaned money to Lakala. On March 31, 1972, the day before the statutory merger with W–L, Lakala owed $314,671.87 to W–L and $68,712.01 to Laure. In addition, Lakala had substantial indebtedness to others on that date.

During these unprofitable years, Lakala defaulted on its base operation lease agreement with the Kalamazoo Airport. Although Lakala already owned land and one hangar at the airport, it was obliged under its lease to build a second hangar. At the time of the merger of Lakala and W–L, the Kalamazoo Airport was seriously threatening to terminate Lakala's lease because of the breached promise to build the hangar. Lakala was financially unable to fulfill the lease terms. The evidence showed without question that if Lakala lost its base operation lease, W–L would once again be without reliable air charter services. W–L also would not have been able to have its prop jet serviced in Kalamazoo since the other base operator at the Kalamazoo Airport, Kal-Aero, could, at that time, only service piston engines.

To enable W–L to continue to receive the air charter and repair services it required, W–L and Lakala entered into a series of transactions which are the subject of inquiry in this appeal. W–L and Lakala entered into a statutory merger on April 1, 1972, whereby W–L received Lakala's assets and assumed its liabilities. It was stipulated that at the time of the merger, Lakala's liabilities exceeded its assets by $194,842.72. W–L issued no stock to Lakala since Laure was the sole shareholder of both corporations.

After the merger, W–L sold Lakala's principal operating assets, which were its accounts receivable, inventory, prepaid in-

surance, property tax credits and equipment, as well as Lakala's name to Maurice Hovious for $32,549.61. Hovious had been chief pilot for Lakala when it was owned by Laure. W–L also leased the real property and existing hangar to Hovious. The lease was for a fifteen-year term and contained an option clause providing for unlimited five-year term renewals. W–L charged no rent for the first twelve months, but a rental rate was to be established on April 1, 1973, with an annual review thereafter. W–L then constructed the additional hangar required under the airport lease. Hovious operated this business under the name "New Lakala."

In other transactions which immediately followed the merger, W–L sold two prop jets, which Lakala had held pursuant to a lease-purchase agreement, and returned two more prop jets, which Lakala had held as dealer on a "sales plan," to the manufacturer. It also sold the "pure" jet which Lakala had held pursuant to a lease agreement. Machinery with a book value of $3,238.78 also was sold for that amount to J. G. Finishing, a corporation controlled by Laure. Sometime later, W–L leased a prop jet from some entity other than New Lakala. W–L admitted that all these transactions were arranged prior to the statutory merger.

W–L also cancelled Lakala's $314,671.81 debt to itself and repaid Lakala's debt of $68,712.01 to Laure. W–L eventually sold the land and hangars to S. P. Air, Inc., a successor of Kal-Aero, in a transaction which was unanticipated at the time of the merger. Hovious simultaneously sold New Lakala to S. P. Air.

On its tax return for the fiscal years ending June 30, 1972 and June 30, 1973, W–L claimed net operating loss carryover deductions attributable to Lakala. In a notice of deficiency, the Commissioner disallowed those deductions on the ground that the statutory merger did not qualify as a reorganization within the meaning of section 368(a)(1)(A) of the Code.[1]

In the trial which ensued in the Tax Court, the taxpayers urged that the purposes of the merger were to assure that W–L had continued air service, to reduce costs and expenses associated with operating two separate entities, to protect W–L's and Laure's financial reputation, to preserve management time and skills, and to alleviate certain labor problems. The Tax Court, however, sustained the Commissioner's claim that the statutory merger did not qualify as a reorganization for tax purposes. Specifically, the Tax Court found that the merger was not supported by a valid business purpose and that there had been no continuity of business enterprise of Lakala after the merger.

With respect to Laure's individual liability, the Commissioner determined, and the Tax Court held, that W–L's repayment of Lakala's debt to him constituted a constructive dividend. Laure had asserted that W–L's repayment of that amount represented only the repayment of the loan which was due from Lakala and which W–L had assumed upon merger. As such, it was a non-taxable return of capital. The Tax Court also sustained the Commissioner's assessment of constructive dividends to Laure for 1971 and 1972 under I.R.C. § 482, since Laure failed to carry his burden of proving the inaccuracy of that assessment. Laure principally had asserted that these assessments could not be sustained since he received no direct or indirect benefits from the statutory merger. These appeals follow.

## II.

The Internal Revenue Code recognizes that certain transactions may occur in such a way that ownership interests are changed, yet no taxable event is deemed to have taken place. Two respected tax commentators have explained the rationale behind the reorganization provisions as follows:

> The traditional theory of the reorganization provisions is that gain or loss should not be recognized on changes of form when the taxpayer's investment remains

---

1. The Commissioner made certain other adjustments not involved in this appeal.

in "corporate solution" or when "a formal distribution, directly or through exchange of securities, represents merely a new form of the previous participation in an enterprise involving no change of substance in the rights and relations of interested parties one to another or to the corporate assets."

B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders ¶ 14.01, at 14–5 (abridged ed. 1971) (quoting in part from *Bazley v. Commissioner*, 331 U.S. 737, 740, 67 S.Ct. 1489, 1490, 91 L.Ed. 1782 (1947)).

The term "reorganization" is defined in section 368(a)(1) of the Code.[2] One type of reorganization is the statutory merger.

2. Section 368(a)(1) of the 1954 Code defines the term "reorganization" as follows:

> § 368. Definitions relating to corporate reorganizations
>
> (a) Reorganization.—
>
> (1) In general.—For purposes of parts I and II and this part, the term "reorganization" means—
>
> (A) a statutory merger or consolidation;
>
> (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation (whether or not such acquiring corporation had control immediately before the acquisition);
>
> (C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of substantially all of the properties of another corporation, but in determining whether the exchange is solely for stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded;
>
> (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356;

I.R.C. § 368(a)(1)(A). Since section 368 is merely a definitional provision, it "does not of its own force have any operative significance." B. Bittker and J. Eustice, *supra*, ¶ 14.02, at 14–9. When the transaction satisfies the definition of "reorganization" under section 368, substantial tax advantages flow to the participating corporations by virtue of other provisions of the Code. Among other advantageous provisions, section 381(c)(1)[3] permits the transferee corporation in a statutory merger to take into account the transferor corporation's net operating loss carryovers, section 381(c)(23)[4] allows the transferee corporation to utilize the transferor corporation's investment credit for investments in depreciable prop-

> (E) a recapitalization; or
>
> (F) a mere change in identity, form, or place of organization, however effected.

3. Section 381(c)(1) derives its own operative significance from section 381(a). Those provisions provide in pertinent part:

> § 381. Carryovers in certain corporate acquisitions
>
> (a) General rule.—In the case of the acquisition of assets of a corporation by another corporation—
>
> \* \* \* \* \* \*
>
> the acquiring corporation shall succeed to and take into account, as of the close of the day of distribution or transfer, the items described in subsection (c) of the distributor or transferor corporation, subject to the conditions and limitations specified in subsections (b) and (c).
>
> \* \* \* \* \* \*
>
> (c) Items of the distributor or transferor corporation.—The items referred to in subsection (a) are:
>
> (1) Net operating loss carryovers.—The net operating loss carryovers determined under section 172, subject to the following conditions and limitations:
>
> \* \* \* \* \* \*

4. Section 381(c)(23), which itself derives its own operative significance from section 381(a), *see* note 3, *supra*, provides as follows:

> (23) Credit under section 38 for investment in certain depreciable property.—The acquiring corporation shall take into account (to the extent proper to carry out the purposes of this section and section 38, and under such regulations as may be prescribed by the Secretary) the items required to be taken into account for purposes of section 38 in respect of the distributor or transferor corporation.
>
> \* \* \* \* \* \*

erty, and section 362(b)[5] provides that the transferee corporation may succeed to the transferor corporation's basis in the assets transferred.

There are, however, limitations to the use of these favorable provisions. The first limitation, the continuity of interest doctrine, was originally created by judicial fiat in *Cortland Specialty Co. v. Commissioner*, 60 F.2d 937 (2d Cir. 1932). This limitation is now embodied in Treas.Reg. § 1.368–1(b). Briefly, this doctrine requires that the original owners of the transferor corporation retain a continuing interest in the reorganized corporation. Since Laure had been the sole shareholder of both W–L and Lakala before the merger, and since he was the sole owner of W–L following the merger, the Commissioner conceded that the continuity of interest requirement had been met in the transactions analyzed here.

The second limitation, now embodied in Treas.Reg. § 1.368–1(b) and (c), was first enunciated in *Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). In *Gregory*, the Supreme Court held that more is required for a valid reorganization than a mere fulfillment of the statutory requirements. The Court found that there must also be a legitimate business purpose for the reorganization.

The third limitation, the continuity of business enterprise doctrine, was also first expressed in *Cortland Specialty Co., supra.*

The basic concept behind this doctrine "is that the receipt of the new ownership interest in an entity that retains none of the business attributes of the shareholder's former corporation is closely akin to a sale" or liquidation. Warner, *Continuity of Business Enterprise: Change in IRS Position*, 80–7 Tax Management Memorandum 3, 9 (April 7, 1980).

It is the lack of a business purpose for the transaction and the lack of continuity of business enterprise, the Commissioner asserts, which precludes the favorable reorganization treatment here.[6]

A.

In this appeal, W–L argues that four separate business purposes support the validity of the reorganization of W–L and Lakala.

1. To assure continued air charter and repair services to W–L, whose business heavily has depended upon reliable air service.

2. To preserve W–L's and Laure's good will and business reputation.

3. To effect cost savings in accounting, auditing, legal, directors' and filing fees.

4. To preserve W–L's and Lakala's management time and skills.

■ The Tax Court found as a fact that none of the above reasons provided a business purpose for the merger. We agree

---

5. Section 362(b) states:

**Transfers to corporations.**—If property was acquired by a corporation in connection with a reorganization to which this part applies, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer. This subsection shall not apply if the property acquired consists of stock or securities in a corporation a party to the reorganization, unless acquired by the exchange of stock or securities of the transferee (or of a corporation which is in control of the transferee) as the consideration in whole or in part for the transfer.

6. While the Commissioner argues that there was neither a business purpose for the merger nor a continuity of business enterprise afterward, we recognize that it is against the Commissioner's best interests to argue for criteria which make it too difficult to satisfy these

limitations. In some cases the Commissioner may wish to recharacterize a transaction as a reorganization which the taxpayer characterized as a liquidation. *See, e. g., Atlas Tool Co. v. Commissioner*, 70 T.C. 86 (1978), aff'd, 614 F.2d 860 (3d Cir.), *cert. denied*, 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980); *Lewis v. Commissioner*, 176 F.2d 646 (1st Cir. 1949); *Standard Realization Co. v. Commissioner*, 10 T.C. 708 (1948). There are numerous reasons for which the Commissioner may wish to do so. The most common one is that the stockholders have received substantial property distributions through the transaction which, if the transaction is treated as a reorganization, the Commissioner will be able to tax at ordinary income rates as "boot." *See Atlas Tool Co. v. Commissioner, supra; Lewis v. Commissioners, supra.*

with the Tax Court's assessment of the third and fourth reasons advanced by W–L, but hold that its findings as to the first and second were clearly erroneous. Either of these two reasons standing alone would be a sufficient business purpose for a valid reorganization. In so holding we admit that there might be some evidence to support the Tax Court's findings on these two reasons, but upon reviewing the entire evidence, we are "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948).

W–L relies particularly on *American Bronze Corp. v. Commissioner*, 64 T.C. 1111 (1975), to support its claim that the merger's achievement of economies in accounting, auditing, legal, directors' and filing fees is a sufficient business purpose to support the validity of the reorganization. In *American Bronze Corp.*, one Goldstein owned all of the stock of American Bronze Corporation and substantially all of the stock of Cleveland Brass Manufacturing Company. American Bronze was engaged in the "jobbing" business of making bronze castings. Cleveland Brass was engaged in approximately the same business. It also manufactured and sold its own product line of valves. In 1968, Cleveland Brass sold most of its assets to the Webster Valve Company, but retained some of its jobbing business equipment. It continued the jobbing business at the American Bronze plant until it merged with American Bronze in December, 1968. Before the merger, therefore, Cleveland Brass and American Bronze were in the same line of business, and indeed shared many of the same customers. In ruling that there was a legitimate business purpose for the merger of the two companies, the Tax Court observed: "The evidence and common sense dictate that the administrative, accounting, and operating expenses ·of conducting the same business serving essentially the same customers with two separate corporations owned by the same individual would be reduced by merging the two corporations." 64 T.C. at 1124–25.

■ While it is true that the merger of W–L and Lakala might have caused a saving of certain expenses, we cannot hold that the Tax Court's determination to the contrary was clearly erroneous. The savings certainly would have to be substantial to support a business purpose for the reorganization, but no substantial savings have been demonstrated here. In *American Bronze Corp.*, the two corporations were in the same line of business and served substantially the same customers. They used the same building. Therefore, the finding that the prior corporate formulations involved an inevitable duplication of activity and expenses was well supported. Here, however, W–L and Lakala had substantially different lines of business. W–L was a customer of Lakala and Lakala, on some occasions, did do work similar to that undertaken by W–L. But the record does not clearly indicate that there was an inevitable duplication of activity and expenses between these two corporations.

■ Similarly, the record contains insufficient evidence to support W–L's claim that the statutory merger was undertaken to preserve W–L's and Laure's management time and skills. The scant evidence in the record consists merely of assertions of that conclusion and not facts to support that conclusion.

We believe, however, that the Tax Court took an unrealistic and limited view of the transactions here in finding that the need for continuing air services did not supply a business purpose for the statutory merger. While the Tax Court recognized that W–L's use of air services was a major part of W–L's growth, it was convinced that this need was fulfilled by the sale of Lakala's operations to Hovious, and not by the merger.

The facts of this case evidence without question the legitimate and pressing concern of W–L for the continuation of adequate air charter and repair services for its own operations. Without the merger, Lakala would have lost its base operation lease with Kalamazoo Airport. In effecting the

merger with Lakala, W–L not only saved the physical facilities, but also enabled its former employee, Hovious, to continue the operational aspect of the business. Since W–L put the land, hangar and base operation lease to use by leasing them to Hovious, the facts here are unlike those in *Wortham Machinery Co. v. United States*, 521 F.2d 160 (10th Cir. 1975). In *Wortham Machinery Co.*, the transferee corporation did not put the transferor corporation's assets to productive use. Instead, it merely attempted to dispose of them. Under such circumstances, the Tenth Circuit was compelled to find no business purpose for the purported reorganization.

Instead, the facts here are much closer to those in *Atlas Tool Co. v. Commissioner*, 70 T.C. 86 (1978), aff'd, 614 F.2d 860 (3d Cir.), cert. denied, 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980). There, like here, the purpose was to maintain the assets in "corporate solution" to insure a ready source of supply of the needed services where substantial risks were apparent. Also, the merger provided the financial backing needed to continue the business. *See WAGE, Inc. v. Commissioner*, 19 T.C. 249 (1952).

The Tax Court rejected W–L's argument that the preservation of W–L's and Laure's good will and business reputation provided a valid reason for the merger because most of the debts Lakala owed were to W–L and Laure. The Tax Court reasoned that little, if any, damage could be done to their reputations by the bankruptcy of Lakala. Since it was stipulated that Lakala's liabilities exceeded its assets by only $194,842.72, and since Lakala owed a total of $383,383.88 to W–L and Laure, the Tax Court properly could have concluded that Lakala had sufficient assets to satisfy all debts except those owed to W–L and Laure. However, we find the conclusion which the Tax Court drew from these facts to be clearly erroneous. Both W–L and Lakala were intimately associated with Laure in the eyes of the Kalamazoo business community. W–L and Laure, therefore, might have suffered some loss of business reputation even though all other creditors were paid off in full because the liquidation or bankruptcy of Lakala might have reflected adversely upon the continued solvency of W–L and Laure.

To the extent, therefore, that the Tax Court's findings are contrary to the foregoing, we are obliged to find them clearly erroneous.

B.

The Commissioner argues that no continuity of business enterprise existed in the transactions here because there was no "perceptible continuity of business other than that evidenced by loss carryover tax attributes," because W–L eventually disposed of all of the assets received in the merger and because Lakala was insolvent at the time of the merger.

It is well settled that there need be neither a complete continuation of the transferor's business in the form it previously had taken nor an identity of the precise business which earlier had been carried on by the transferor corporation. *Morely Cypress Trust v. Commissioner*, 3 T.C. 84 (1944); *Becher v. Commissioner*, 221 F.2d 252 (2d Cir. 1955); *Pebble Springs Distilling Co. v. Commissioner*, 231 F.2d 288 (7th Cir. 1956). The Commissioner admits that this means W–L must merely show that it retained and used some of Lakala's assets, but argues that the evidence shows that W–L eventually sold all of the assets it received in the merger with Lakala.

In *Standard Realization Co. v. Commissioner*, 10 T.C. 708 (1948), the Tax Court held that there was no continuity of business enterprise where the transferee corporation had a preconceived plan to sell all of the assets of the transferor corporation, and where only a small part of the transferor corporation's assets had, in fact, been transferred. Similarly, in *Wortham Machinery Co. v. United States, supra*, the Tenth Circuit observed that: "Liquidation of assets is not continuation of a business enterprise." 521 F.2d at 163.

Unlike those cases, however, W–L did not have a preconceived plan to dispose of *all* the assets it received from Lakala. Although W–L never intended to operate La-

kala's air charter and repair service, the record contains convincing evidence that at the time of the merger it intended to retain the interest in the base operation lease and existing hangar and to construct an additional hangar as required by the lease's terms. Therefore, it would be improper to treat the later sale of the land and hangar to S. P. Air as being a part of the merger transactions.

The Commissioner further argues that there was no continuity of business enterprise because the assets sold immediately after the merger constituted the majority of the assets transferred by Lakala to W–L. We disagree. The courts have long recognized that not all of the transferor's premerger assets need be turned over to the transferee for the reorganization to be valid. See Pebble Springs Distilling Co. v. Commissioner, supra; Morely Cypress Trust v. Commissioner, supra. If some assets permissibly may be disposed of before the reorganization, some assets permissibly may be sold immediately after the reorganization pursuant to a pre-existing plan. All that is required is that the transferee receive and continue to use some minimum amount of the transferor's assets. See American Bronze Corp. v. Commissioner, supra. The merger here has met that requirement. The assets retained by W–L were very valuable to its business. The land and hangars were leased free of charge for one year to Maurice Hovious, but that lease arrangement only underscores the crucial importance those assets had to W–L's ability to obtain reliable air charter and repair services. Therefore, while the record could be clearer in regard to the relative value of the assets retained, adequate evidence shows that their value was indeed substantial, both in relation to other assets transferred and in importance to W–L due to its continuing need for air charter and repair services at Kalamazoo Airport.[7] This is all that is required under the reorganization provisions.

Finally, while the Commissioner points to the insolvency of Lakala at the time of the merger[8] as a basis for finding that there

7. Surprisingly, W–L introduced no evidence at trial concerning the March 31, 1972 market value of the assets Lakala transferred to it. The book value of those assets, however, may be discovered by analyzing the trial exhibits. Lakala's tax return for the fiscal year ended March 31, 1972 is the subject of Joint Exhibit 15-O. A copy of the agreement of merger between W–L and Lakala is attached to the tax return. The first supplementary schedule contained in the agreement of merger is a generalized list of the assets transferred to W–L at book value. Further detail on these assets is provided by Schedule G and line 11 of Schedule L of Lakala's March 31, 1972 tax return. From these sources, we were able to devise the following table which lists each category of asset transferred, the value of those assets at cost less accumulated depreciation and the percentage which each asset category comprised of the total assets transferred:

| PROPERTIES TRANSFERRED | COST LESS DEPRECIATION | % OF TOTAL ASSETS TRFR'D |
|---|---|---|
| Accounts receivable | $ 21,812.82 | 3.38% |
| Inventories | 9,496.74 | 1.47% |
| Prepaid expenses | 27,145.12 | 4.21% |
| Furniture | 422.16 | .07% |
| Transportation equipment | 370,520.15 | 57.51% |
| Machinery | 5,356.26 | .83% |
| Land & Bldgs. ($34,000.00 plus $141,548.31) | 175,548.31 | 27.25% |
| Prepaid interest | 33,996.22 | 5.28% |
| | $644,297.78 | 100.00% |

This analysis shows that while the land and hangar did not comprise the most valuable asset category transferred when valued at cost less accumulated depreciation, they were indeed a substantial portion of the total assets transferred.

8. Since no evidence of the March 31, 1972 market values of the assets transferred by Lakala to W–L was introduced into evidence, it is impossible to determine from the record upon what values the stipulation that Lakala's liabilities exceeded its assets by $194,842.72 was

was no continuity of business enterprise, no previous cases to our knowledge have held that insolvency was a bar to treating a transaction as a reorganization. The Tax Court does not seem to have gone that far here, although it at least did view Lakala's insolvency as one factor vitiating the purported reorganization's continuity of business enterprise. Implicit in the Tax Court's decision is the assumption that there can be no continuity of business enterprise when there is in effect nothing left to continue.

W–L argues that ever since the Tax Court's decision in *Norman Scott, Inc. v. Commissioner*, 48 T.C. 598 (1967), it has been recognized that an insolvent corporation may be the subject of a valid reorganization. In *Norman Scott, Inc.*, three corporations which were in the automobile dealership business merged, with Norman Scott, Inc. as the surviving corporation. Before the merger, the other two corporations were insolvent. The Commissioner did not dispute that there was a continuity of business enterprise in this three-way merger, but argued that there was no continuity of interest because of the insolvency of the two corporations. Finding that there had been a continuity of interest, the Tax Court upheld the validity of the reorganization.

While *Norman Scott, Inc.* mainly pertains to a continuity of interest question, it dem-

onstrates that under the proper circumstances there can be a continuity of business enterprise in a merger with an insolvent corporation. Those proper circumstances have been established here. There was a valid business purpose for the merger. A continuity of the business enterprise otherwise has been shown. Finally, the evidence has shown that while Lakala might have been insolvent in an accounting sense, there were assets left in the business which were sufficiently valuable, at least to W–L, which made the continuation of Lakala's business, albeit in a changed manner, worthwhile.

■■ We therefore hold the Tax Court's decision finding no continuity of the business enterprise in the statutory merger between W–L and Lakala clearly erroneous. Since there was a legitimate business purpose for the statutory merger, and since the merger resulted in a continuity of the business enterprise, it was a valid reorganization under section 368(a)(1)(A).[9]

### III.

After the merger of Lakala and W–L, W–L repaid the $68,712.01 balance of the debt which Lakala had owed Laure for monies advanced to it. The Commissioner claimed, and the Tax Court agreed, that since the merger was not a valid reorgani-

based. Certainly it was not based upon the book values of those assets. Joint Exhibit 15–O indicates that $644,297.78 worth of assets valued at cost less accumulated depreciation were transferred to W–L and liabilities in the amount of $960,103.95 were assumed by W–L. Therefore, at book value Lakala's liabilities exceeded its assets by $315,806.17. The amount by which Lakala's liabilities exceeded its assets has any true significance in regard to Lakala's insolvency only if it is based upon market values.

**9.** New Treas.Reg. § 1.368–1(d) supports our conclusion here, although it only applies to acquisitions occurring after February 1, 1981. According to Treas.Reg. § 1.368–1(d)(2):

Continuity of business enterprise requires that the acquiring corporation (P) either (i) continue the acquired corporation's (T's) historic business or (ii) use a significant portion of T's historic business assets in a business.

The phrase "significant portion of T's historic business assets" is somewhat explained in Treas.Reg. § 1.368–1(d)(4)(iii):

In general, the determination of the portion of a corporation's assets considered "significant" is *based on the relative importance of the assets to operation of the business.* However, all other facts and circumstances, such as the net fair market value of those assets, will be considered. (Emphasis added).

We have considered all the facts and circumstances of this merger, including the relative value of the assets retained by W–L. Because of the extreme importance of the assets retained to W–L's business, we find that they constituted a substantial portion of the total assets transferred to W–L. Therefore, we believe that those assets would be considered "significant" under the new Treasury Regulation.

zation, W–L's repayment of the debt constituted a constructive dividend to Laure. Since we have held that the reorganization was valid, it necessarily follows that Laure received no constructive dividend through this repayment. It was merely the repayment of a legitimate obligation of W–L as the successor corporation under the reorganization. The repayment of a legitimate debt, even by a corporation to its controlling stockholder, is a return of capital. *See Sammons v. Commissioner*, 472 F.2d 449 (5th Cir. 1972).

## IV.

The Commissioner sent W–L a notice of deficiency disallowing $20,195.49 deducted as "outside tool and die costs" on its tax return for the fiscal year ended June 30, 1972. A corresponding adjustment was made on the notice of deficiency sent to George Laure for the calendar years 1971 and 1972. Laure's income for 1971 was increased by $14,947.93 and his income for 1972 was increased by $5,247.56.

Prior to the trial in the Tax Court, W–L stipulated that the Commissioner correctly disallowed its deduction for outside tool and die costs for the fiscal year ended June 30, 1972 in the amount of $20,195.49. The stipulation, however, was silent concerning the accuracy of the corresponding adjustment on Laure's personal tax return. Laure presented no evidence at trial which either explained the basis for the section 482 adjustments to his tax return or disputed their accuracy. The Tax Court, therefore, sustained the Commissioner's determination on these two adjustments.

On appeal, Laure makes essentially three arguments regarding this issue. First, this adjustment on Laure's notice of deficiency was merely overlooked in drafting the stipulation which conceded the $20,195.49 adjustment on W–L's part. Second, since Laure testified that he received no direct or indirect benefit from the merger, these amounts could not be constructive dividends to Laure. Third, since part of the adjustment was made for the 1971 tax year while the merger did not occur until 1972, the adjustments were clearly in error.

Laure's arguments miss a number of essential points. Laure does not seriously contest the fact that the taxpayer has the burden of proving that the Commissioner's assessment is in error. *See* Rule 142(a), Tax Court Rules of Practice and Procedure. Laure, however, entered no evidence whatever into the record which in any way connected the assessment of these constructive dividends for 1971 and 1972 with the merger of W–L and Lakala. Nor does anything else in the record suggest that the section 482 reallocation is clearly in error if the merger is found to be a valid reorganization. Therefore, Laure's argument that these could not be constructive dividends to him because he received no direct or indirect benefit from the merger is unpersuasive. His argument that the section 482 reallocation is clearly in error because part of it was attributed to his 1971 tax return whereas the merger occurred in 1972 is similarly unavailing. Finally, while certain colloquies between the Tax Court and trial counsel for both sides somewhat suggest that this matter was never intended to be in issue, Laure argued this point in his post-trial brief to the Tax Court. This clearly suggests that he recognized this matter as an issue in the trial below. Therefore, the Tax Court's decision sustaining the Commissioner's determination on these two items is affirmed.

Accordingly, the judgment of the Tax Court is affirmed in part, reversed in part and remanded for proceedings consistent with this opinion.