RAILROAD DYNAMICS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Railroad Dynamics, Inc. v. Commissioner
Docket Nos. 10147-81, 4338-82.
United States Tax Court
T.C. Memo 1984-40; 1984 Tax Ct. Memo LEXIS 632; 47 T.C.M. (CCH) 957; T.C.M. (RIA) 84040; January 24, 1984. Owen A. Knopping and Leonard J. Schwartz, for the petitioner. Joellyn R. Cattell, for the respondent. FAY
MEMORANDUM OPINION FAY, Judge: Respondent determined deficiencies in petitioner's Federal income tax as follows: Taxable Year Ended
Deficiency
April 30, 1975
$25,147
April 30, 1976
25,147
April 30, 1977
39,121
April 30, 1978
48,744
April 30, 1979
62,698
April 30, 1980
83,660
*633 These cases have been consolidated for trial, briefing, and opinion. The only issue is whether petitioner is entitled to deduct under section 162(a)(1)[1] the entire amount of salary and bonuses paid to its president.
The parties submitted this case fully stipulated pursuant to Rule 122. [2]
Petitioner, Railroad Dynamics, Inc., is a Pennsylvania corporation, and its principal place of business was in Ardmore, Pa., when the petition was filed herein. Petitioner was organized by Stuart Schwam (Schwam) and Frank Hughes (Hughes) in 1966 for the purpose of manufacturing and assembling shock absorbing devices for railroad freight cars. Schwam received both a college and a master's degree in civil engineering from the University of Pennsylvania *634 (herein Penn). From 1957 through June 1959, he worked at Penn as a research assistant in the field of structural dynamics. After leaving Penn, he was employed by Boeing Vertol (herein Boeing) as a dynamics engineer. During the course of his employment at Boeing, Schwam developed expertise in the field of hydraulics. In September 1962 he left Boeing and returned to Penn as a Ph.D. candidate and teaching fellow in the field of engineering mechanics. Hughes was a manufacturer's representative in the railroad industry. He met Schwam in 1965 and at that time asked him to assist in solving a vibration problem experienced by railroad freight cars which affected their stability and caused derailments. They agreed that Schwam would contribute his professional knowledge and experience and that Hughes would supply the capital. Schwam used a computer to solve the problem and to develop the requisite physical hardware. By May 1966, he had manufactured and tested six prototype units (herein the product). After the product was developed, Schwam and Hughes received an order from the Pennsylvania Railroad to equip 500 cars with the product for $259,000. It was at this time that they formed *635 petitioner to manufacture and sell the product. Schwam and Hughes each owned an equal number of petitioner's common stock, and because he had already invested more than $17,000 in the product Hughes also received 170 shares of petitioner's preferred stock. From 1967 through 1975, petitioner needed approximately $500,000 to finance its activities. Since neither petitioner nor its shareholders were able to raise the requisite funds, petitioner approached Buckeye International, Inc. (herein Buckeye) for financial help in 1967. They agreed that Buckeye would lend petitioner money, [3] make capital contributions, and guarantee all of petitioner's loans from outside sources. As part of this arrangement, petitioner redeemed all of Hughes' common and preferred stock, and Buckeye became a 50 percent shareholder along with Schwam. From its inception, Schwam has been petitioner's president and chief operating officer. From 1967 through 1975, Schwam was also the sole research and development engineer, purchasing agent, production and quality control manager, marketing person, and *636 financial manager. After 1975, although petitioner employed several other people, Schwam continued to supervise and direct all of these facets of the company. Throughout this time, Schwam also spent a great deal of time traveling in the United States and overseas on business for petitioner. Schwam entered into an employment contract with petitioner on December 2, 1974 (herein the employment contract). Pursuant to the employment contract, at the beginning of each fiscal year petitioner's board of directors fixed Schwam's compensation in the form of a salary and a bonus. Schwam's bonus each year was computed on the basis of a predetermined percentage of petitioner's net income. [4]
By letter dated June 23, 1976, petitioner submitted to respondent a request for a ruling concerning the tax consequences of a proposed corporate recapitalization *637 under section 368(a)(1)(E).Petitioner's stated business reason for the recapitalization was to provide its corporate shareholder (Buckeye) a return on its capital investment in the form of dividends. Petitioner, however, did not have enough working capital to pay both Schwam and Buckeye Significant amounts of dividends. Thus, the propcsed reorganization of petitioner's capital structure was to provide Buckeye a return on its investment without necessitating a substantial cash outlay by petitioner. Petitioner's plan required Schwam to exchange all of his old common stock for 50 shares of new common stock. Buckeye was to continue to hold 50 shares of old common stock. No dividends were to be declared on the new common stock until a dividend equal to 1/4 of one percent per share of petitioner's annual net income for the preceding fiscal year was declared on each share of the old common stock (herein the priority dividends). The priority dividends were not cumulative. Any further dividends would be shared equally by shareholders of both new and old common stock. Based solely on the information submitted by petitioner, respondent approved the recapitalization as a reorganization within *638 the meaning of section 368(a)(1)(E). Petitioner paid dividends to its shareholders of record, Schwam and Buckeye, as follows: [5]
Taxable Year Ended April 30
Schwam
Buckeye
1975
0
0
1976
0
0
1977
0
$186,280
1978
$40,000
141,550
1979
40,000
172,432
1980
75,000
256,874
1981
0
0
1982
0
0
On its returns for the years in issue, petitioner deducted the entire amount of salary and bonuses paid to Schwam as compensation for his services. In his notices of deficiency, respondent determined that a portion of each bonus was not deductible. The only issue is whether petitioner is entitled to deduct the entire amount of salary and bonuses *639 paid to Schwam. Section 162(a)(1) allows as a deduction "a reasonable allowance for salaries or other compensation for personal services actually rendered." The test of deductibility requires that (1) the amounts paid must be reasonable and (2) the payments must be entirely for services rendered. Sec. 1.162-7(a), Income Tax Regs.; see Nor-Cal Adjusters v. Commissioner,503 F.2d 359, 362 (9th Cir. 1974), affg. a Memorandum Opinion of this Court. Respondent concedes herein that the salary and bonuses petitioner paid Schwam were reasonable. He argues, however, that a portion of Schwam's bonus each year was, to the extent of Buckeye's priority dividend in that year, a disguised dividend. Thus, resolution of the issue herein depends on whether a portion of Schwam's bonus each year was intended to be compensation for his services or whether it was merely a disguised dividend. the intent to compensate for services rendered is it deductible It is well settled that only if a payment is made with as compensation. Paula Construction Co. v. Commissioner,58 T.C. 1055, 1058 (1972), *640 affd. 474 F.2d 1345 (5th Cir. 1973); Klamath Medical Services Bureau v. Commissioner,29 T.C. 339, 347 (1957), affd. 261 F.2d 842 (9th Cir. 1958). Whether such intent has been shown is a factual question to be decided on the basis of the particular facts and circumstances of the case. Electric & Neon, Inc. v. Commissioner,56 T.C. 1324, 1340 (1971), affd. 496 F.2d 876 (5th Cir. 1974). Respondent contends that the payment of the bonuses to Schwam and the payment of the priority dividends to Buckeye were part of an overall scheme on the part of petitioner to pay its shareholders equal amounts of dividends and yet obtain a deduction for the amounts paid to Schwam. Based on the record before us, however, we do not find that any such scheme existed. The priority dividends paid to Buckeye were made possible by the recapitalization of petitioner which respondent approved as a reorganization under section 368(a)(1)(E) in September 1976. In the ruling request petitioner submitted to respondent in connection with the recapitalization, petitioner clearly informed respondent that the major purpose for the *641 recapitalization was to allow petitioner to pay Buckeye priority dividends. In approving petitioner's recapitalization, respondent did not find anything objectionable in petitioner's desire to pay priority dividends. Although respondent is certainly not precluded from now arguing that the bonuses and the priority dividends are part of an overall scheme, it is clear that independent business reasons can exist for both the payment of priority dividends and the payment of bonuses. The mere fact that such payments were made in the same years does not alone support a finding that the two kinds of payments were interdependent. In fact, based on the record herein, we find ample evidence that the two kinds of payments were independent of each other. First, Schwam organized petitioner and has always been its president and chief operating officer. He has spent a great deal of time working and traveling for petitioner, and his efforts are the primary reason petitioner has become a profitable corporation. In order to compensate Schwam for his substantial services, petitioner entered into the employment *642 contract with him.Beginning with its fiscal year ended April 30, 1975, petitioner's board of directors determined Schwam's total compensation for each year. His compensation package included a base salary and a predetermined formula for computing a bonus.The use of bonuses as part of an employee's total compensation is a common practice, and standing alone, certainly does not indicate the payment of disguised dividends. See Laure v. Commissioner,70 T.C. 1087, 1098 (1978), affd. in part and revd. in part on other issues 653 F.2d 253 (6th Cir. 1981). Furthermore, the fact that Buckeye's priority dividends were not declared by petitioner's board of directors until the end of its fiscal year is evidence that petitioner's payment of bonuses and priority dividends were independent of each other and not part of an overall scheme to pay Schwam disguised dividends. This clearly shows that Buckeye was not assured of receiving a priority dividend even though Schwam was guaranteed *643 a fixed salary and bonus for his services at the beginning of petitioner's fiscal year. In fact, Schwam received bonuses totalling $214,371 and $75,580 for fiscal years ended April 30, 1981 and 1982, respectively, even though Buckeye was not given a priority dividend in either year. Finally, this is not a case where petitioner has never paid a dividend to its president-shareholder. See Charles McCandless Tile Service v. United States,422 F.2d 1336, 1339 (Ct. Cl. 1970). Schwam received dividends in three of the years in issue. [6] This fact certainly provides additional evidence that petitioner did not intend any portion of Schwam's bonuses to be a disguised dividend. Respondent counters, however, that Schwam's right to exchange his new common stock for old common stock is evidence that the two payments were interrelated. This contention is based on respondent's belief that if Schwam was dissatisfied with his bonuses he would have exchanged his stock and thereby become entitled to priority dividends. We, however, are not persuaded *644 by this contention because there is no indication that if Schwam had exchanged his stock petitioner would have then stopped paying him the same bonus. Respondent also argues that since Buckeye's first priority dividend included retroactive dividends for fiscal years ended April 30, 1975 and 1976, petitioner intended a portion of Schwam's bonus each year to be a disguised dividend. This contention fails to take into account that if for any reason petitioner's proposed recapitalization had not been implemented, Buckeye would not have been paid any priority dividends even though Schwam had already received bonuses totalling $186,242 and $204,000 for fiscal years ended April 30, 1975 and 1976, respectively. Thus, the payment of retroactive priority dividends does not persuade us that petitioner's payment of bonuses and priority dividends were interrelated. Accordingly, for the above reasons, we find that petitioner intended the entire amount of Schwam's salary and bonuses to be paid solely as compensation. Thus, petitioner is entitled to deduct the entire amount of the bonuses. [7]
*645 To reflect the foregoing, Decision will be entered for petitioner.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. At the call of the case, petitioner submitted a motion for summary judgment pursuant to Rule 121. Since the parties have submitted this case fully stipulated, it is now unnecessary for us to consider petitioner's motion.↩
3. All of Buckeye's loans to petitioner had an interest rate of one percent and were repaid in 1975.↩
4. Schwam received the following total compensation for the years in issue: ↩
Taxable Year Ended April 30
Salary
Bonus
Total
1975
$50,000
$186,242
$236,242
1976
50,000
204,000
254,000
1977
52,000
196,225
248,225
1978
59,800
203,102
262,902
1979
59,800
264,864
324,664
1980
65,000
363,748
428,748
5. Buckeye's dividends consisted of the following amounts of priority dividends: Taxable Year Ended April 30
Priority Dividend
1977
$186,280
1978
101,550
1979
132,432
1980
181,900
In addition, Buckeye's priority dividend for 1977 was equal to the sum of 1/4 of 1 percent per share of petitioner's aggregate net income for fiscal years ended April 30, 1975, 1976, and 1977. Thus, the amounts of priority dividends for those years were $51,883, $52,895, and $81,502, respectively.↩
6. In fiscal years ended April 30, 1978, 1979, and 1980, Schwam received dividends of $40,000, $40,000 and $75,000, respectively.↩
7. The burden of proving that a portion of Schwam's bonuses was not intended to be compensation for services rendered was placed upon respondent since deemed to be a new matter within the meaning of Rule 142(a). Even if the burden of proof had not been so placed, however, petitioner would have prevailed because it has presented sufficient evidence to satisfy its burden.↩