JAMES H. KEAN, TRANSFEREE, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

RICHARD L. GRAY, TRANSFEREE, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 19346-81, 19347-81.     Filed September 8, 1988.

*John H. Birkeland* and *Neil M. Goff,* for the petitioners.
*Mark H. Howard,* for the respondent.

CHABOT, *Judge:* Respondent determined that petitioners
are liable as transferees of the assets of Urban Waste

Resources Corp. (hereinafter sometimes referred to as Urban) for a deficiency in Federal corporate income tax for Urban's taxable year 1975[1] in the amount of $34,032,[2] as follows:

| Docket No. | Petitioner | Transferee liability |
|------------|------------|----------------------|
| 19346-81 | James H. Kean | $34,032 |
| 19347-81 | Richard L. Gray | 34,032 |

These cases have been consolidated for trial, briefs, and opinion. After concessions by petitioners, the issues for decision[3] are as follows:

(1) Whether Urban is entitled to a bad debt deduction under section 166(a)[4] on account of certain transfers used to pay debts of related companies; and

(2) Whether petitioners are transferees of Urban under section 6901 and so are liable for Urban's income tax for Urban's taxable year 1975.

### FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petitions were filed in the instant cases, petitioner James H. Kean (hereinafter sometimes referred to as Kean) and petitioner Richard L. Gray (hereinafter sometimes referred to as Gray) resided in Boulder, Colorado.

*Ownership and control of the entities.*

These cases involve transfers of property or payments of money made by Urban to pay debts of one or more of the

---

[1]Unless indicated otherwise, all references to Urban's taxable years are to Urban's fiscal years ending Sept. 30.

[2]This deficiency is based, in part, on the following: Urban had claimed a $69,369 net operating loss on its 1976 tax return. This resulted, in part, from a $61,445 bad debt deduction claimed for that year. After carrying back the net operating loss to its taxable years 1974 and 1975, and submitting Form 1139, Urban received a refund of $4,868 for its taxable year 1975. Respondent disallowed the bad debt deduction for Urban's taxable year 1976 and calculated that the net operating loss for Urban's taxable year 1976 should have been $7,924. When carried back, the $7,924 net operating loss is fully absorbed by Urban's taxable year 1974. Thus, respondent disallowed in full the net operating loss carryback to Urban's taxable year 1975 and, in addition, disallowed a bad debt deduction of $102,762 for Urban's taxable year 1975. These disallowances, together with certain other matters conceded by petitioners, result in respondent's determination of a 1975 deficiency of $34,032.

[3]The amount of Urban's investment credit is derivative and depends on our resolution of the bad debt deduction issue.

[4]Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the year in issue.

following related entities: Mesa Sand & Gravel, Inc. (hereinafter sometimes referred to as Mesa); Products Recovery Corp., Inc. (hereinafter sometimes referred to as PRC); Products Recovery Corp.—Boulder (hereinafter sometimes referred to as PRC/Boulder), a small business corporation; Products Recovery Corp.—Ft. Collins (hereinafter sometimes referred to as PRC/Ft. Collins), a small business corporation; Products Recovery Corp.—Denver (hereinafter sometimes referred to as PRC/Denver); and Products Recovery Properties, Ltd. (hereinafter sometimes referred to as Properties), a limited partnership.[5] During the period before us, Kean and Gray held ownership interests and corporate offices (where applicable), in these entities, as shown in table 1.

TABLE 1

| Entity | Kean | Gray |
|---|---|---|
| Urban | 54.00 President, Director | 18.00 Director |
| Mesa | 55.50 Secretary, Treasurer | 18.80 President |
| PRC/Boulder | 63.00 President | 7.00 |
| PRC/Ft. Collins | 63.00 President | 7.00 |
| PRC/Denver | 63.00 President | 7.00 |
| PRC | 72.22 President | 11.11 |
| Properties[6] | [7] | 7.00 (limited partner) |

Thus, Kean directly controlled Urban, Mesa, and each of the entities comprising the PRC Group, except for Properties (which Kean indirectly controlled through his ownership interest in PRC). Together with Douglas Smith (hereinafter sometimes referred to as Smith) and Ray Meacham, Kean directed the day-to-day management of these entities. Gray devoted part of his time to PRC/Ft. Collins, PRC/Boulder, and PRC/Denver, but was not involved in the day-to-day management thereof. Both Kean and Gray made the final management decisions with respect to actions to be taken by Urban, Mesa, and the PRC Group. Urban, Mesa, and the PRC Group shared most of the same office staff. Separate books and records were maintained for each entity.

[5]For purposes of simplicity, PRC, PRC/Boulder, PRC/Ft. Collins, PRC/Denver, and Properties will hereinafter sometimes be referred to as "the PRC Group".

[6]PRC owned a 70-percent general partnership interest in Properties.

[7]Petitioners did not object to respondent's proposed finding of fact that Kean was a partner in Properties. However, the stipulated exhibits that respondent relied on for this finding, which are the partnership information returns prepared for Properties for 1975 and 1976, do not show Kean to have been a partner of Properties. Our finding is in accordance with the parties' stipulation and not with the agreed-on proposed finding of fact.

*Organization and operation of the entities.*

Before 1971, the Rich-Land Co. (hereinafter sometimes referred to as Rich-Land) engaged in solid waste disposal, including resource recovery work and composting, in Boulder County, Colorado. Rich-Land encountered financial difficulties. It then was acquired by petitioners and several other people. Rich-Land became Urban in 1971.

About 1971, Urban acquired a lease on a 320-acre tract of land (hereinafter sometimes referred to as the 320-acre tract) southeast of Boulder, Colorado, and began operating a sanitary landfill on the westerly 80 acres of that tract. Because there were some water and drainage problems on the remainder of the 320-acre tract and because the existing landfill was nearly filled, Urban recognized a need for additional facilities. On December 18, 1972, Urban leased an additional 80-acre tract (hereinafter sometimes referred to as the south tract) that was adjacent to the 320-acre tract and south of the above-described landfill site. The lease to the south tract was amended on August 3, 1973, to grant Urban the right to mine, remove, and dispose of the gravel or clay located on the south tract.

Urban planned that the south tract would have two uses, described in a Report on Gravel Mining and Sanitary Landfill Operations, prepared for Urban in 1973 by Black & Veatch, Consulting Engineers (hereinafter sometimes referred to as the Black & Veatch report), as follows:

> The proposed site is planned to serve a dual purpose. Deposits of gravel are to be removed and processed for construction use and the void created, refilled by sanitary landfill of solid waste using on-site soils and screenings from the gravel processing for cover material. The two functions will proceed simultaneously but will be sufficiently separated to obviate operational problems.

Mesa was organized in 1973 to mine a vein of gravel located on the South Tract.

Pursuant to a memorandum of sublease and agreement (hereinafter sometimes referred to as the sublease) dated December 14, 1973, Urban subleased the south tract to Mesa with the understanding that Urban would conduct all the excavation on the leased premises in connection with its landfill operation. Mesa would then have the right to use

the excavated material to extract the sand and gravel therefrom, to excavate additional sand and gravel from the south tract, and to sell this sand and gravel. In consideration of the sublease, Mesa agreed to pay Urban $350 per month during the initial lease term (January 1, 1974, through December 31, 1978) plus $0.55 for each ton of refuse brought to and disposed of in Urban's landfill by commercial refuse haulers.

On January 3, 1974, the Board of County Commissioners of Boulder County approved Urban's and Mesa's application for a special use permit to mine sand and gravel and to conduct a sanitary landfill operation, and ancillary uses thereto, in accordance with the above-described plan.

Before Rich-Land was acquired by petitioners and other persons and transformed to Urban, Rich-Land was doing composting and resource recovery work at the then-operating landfill on the 320-acre tract. Both Boulder County and the City of Boulder wanted this work to be continued after Urban was formed and so the PRC Group was organized to recover and process waste paper from landfill sites and to sell it in baled and compressed form to markets in the Denver area. Specifically, the PRC Group was to collect, compress, and bale such items as newsprint, corregated cardboard, and a large volume of waste paper from the Coors Brewery printing shop in Boulder, including label stock and six-pack containers. The baled waste paper collected by the PRC Group was to be sold in large part pursuant to an agreement dated September 24, 1974, between PRC and Victor Mill Supply Co. (hereinafter sometimes referred to as Victor Mill), a waste paper broker. Victor Mill was going to sell the compressed and baled waste paper to a Coors Container Corp. mill then under construction in Ft. Lupton, Colorado. The term of the Victor Mill contract was to be for a period of 2 years beginning with the date of the first sale (anticipated to be January 1, 1975) or March 1, 1976, if that date was earlier. Victor Mill agreed that during this period it would buy an average of at least 1,500 tons per month from PRC, charging PRC certain specified brokerage fees depending on the market price of the waste paper.

These separate entities were economically interrelated. That is, Mesa, through the sublease, had access to a vein of gravel that it could excavate, process, and sell; Urban derived income through the sublease and depended on Mesa's removal of the gravel so that it could engage in its landfill operation; the PRC Group relied on both of these entities performing their functions so that it would have waste paper to process and sell. Thus, the success or failure of one entity had a beneficial or adverse effect on the other entities.[8]

As a result of the economic relationship among the various entities and the common business operations (i.e., similar office staff and business premises), a practice developed whereby cash of one entity would frequently be transferred to another entity or would be used to pay the expenses of that other entity. Smith, who personally maintained or supervised the books and records of the entities, established a system pursuant to which he could ensure that the books and records of the entities could be kept separate. Thus, to the extent a transaction occurred which represented a payment or receipt by one entity on behalf of another and possibly itself as well (e.g., salaries for common employees, payments to common suppliers or insurers, petty cash expenditures), Smith attempted to allocate the item among the entities. To maintain the independence of the books and records of the entities, a payment made by one entity on behalf of another was to be recorded in the books of the paying entity as an account receivable and in the books of the nonpaying entity that benefited from the payment as an account payable. Periodically, either monthly or quarterly, Smith analyzed the books and records of all the entities in an effort to reconcile the intercompany accounts so that all repayments were properly recorded.

For Urban's transfers to, or payments on behalf of, the related entities, which were maintained on an open account basis, neither Urban nor the related entity (1) prepared or executed notes or contracts evidencing the transfer or payment; (2) charged or paid any interest; (3) prepared a

---

[8]Indeed, one outside company apparently recognized the economic relationship among the three entities by proposing to merge Urban, Mesa, and PRC into itself in exchange for the stock of that company.

schedule for repayment; (4) specified a due date for repayment; or (5) required or gave security or collateral. Because money, services, and loans were transferred frequently among the entities, it was deemed inappropriate to charge interest or prepare promissory notes with respect to the transfers. Rather, the transfers among the related entities were treated like those for any other trade creditor who had an ongoing credit relationship with the companies and who was expected to pay balances timely. Also, with Kean as the majority shareholder of every one of the related corporations, it was thought that the interest owed by any one of the related entities to any other of the related entities would "wash out".

After Urban, Mesa, and the PRC Group were formed, as described above, Mesa bought a gravel spread, a generating plant, and a crusher to be used in processing the gravel from the south tract. However, Mesa encountered two problems that caused it to develop serious operational and financial difficulties during the summer of 1975. The primary problem was that, in processing the gravel, Mesa was unable to clean off the clay thereon adequately and, thus, it produced a defective product which could not be sold to its largest customer for use as concrete. Secondly, during the period 1974 through 1975, there was a slowdown in the building industry and so the gravel business suffered accordingly. By September 1975, Mesa's financial difficulties were so severe that it had sold off much of its equipment, leaving it with the ability to produce only "pit run" (or base coarse), i.e., material taken directly from the ground and sold without any further processing. Mesa hoped to resolve its financial problems by making a contract with the Colorado State Highway Department to sell pit run for use in construction of the Boulder 47th Street bypass and other State projects. However, this contract never came to fruition and Mesa was able to sell only a small amount of pit run. Mesa never did any gravel processing or mining after September 1975.

For its fiscal years ending August 31, 1974, through August 31, 1977, Mesa reported taxable income or (loss) on its tax returns, as shown in table 2.

### TABLE 2

*FYE Aug. 31—*

| | |
|---|---|
| 1974 ............................................... | ($36,024) |
| 1975 ............................................... | (110,727) |
| 1976 ............................................... | ([9]78,292) |
| 1977 ............................................... | [10] |

Similarly, the PRC Group encountered financial difficulties during the summer of 1975. Before that time, from the summer of 1974 to early 1975, the PRC Group had been recovering waste paper and corregated material from the south tract. In fact, the PRC Group collected and baled large inventories of waste paper. Several hundred tons of waste paper were collected pursuant to the Victor Mill contract, and bills were issued for payment therefor. From this, the PRC Group anticipated significant revenues because Victor Mill was obligated to buy an average of at least 1,500 tons of waste paper per month. However, because the U.S. economy experienced a recession during 1974 and 1975 which significantly impacted on the paper products recycling industry, there resulted (1) a dramatic decline in the price of recyclable waste paper, (2) high inventory levels for paper products because of minimal consumer and commercial demand, and (3) the depressed state of U.S. exports of paper stock. Also, Victor Mill, the PRC Group's major customer, failed to make payments in accordance with its contract with PRC. As a result, during the summer of 1975, the PRC Group encountered severe financial problems; the PRC/Denver paper processing plant was shut down by August 1975; and PRC/Ft. Collins never started its operation. The PRC Group ceased operations entirely by the spring of 1976. For 1974 through 1976, the members of the PRC Group reported taxable income or (loss) (or, in the case of Properties, ordinary income or (loss)) on their calendar year tax returns (or, in the case of Properties, information returns), as shown in table 3.

---

[9]This amount is pursuant to an amended corporate tax return filed in March 1982; the original amount reported was ($139,315).

[10]On Mesa's 1977 tax return, also filed in March 1982 (see note 9, *supra*), Mesa showed $95,233 of income from "cancellation of debt to Urban", total income of $95,099, and taxable income before net operating loss of $80,413. The taxable income was reduced to zero by carryovers of the net operating losses shown on Mesa's tax returns for 1974, 1975, and 1976.

TABLE 3

|  | 1974 | 1975 | 1976 |
|---|---|---|---|
| PRC | ($7,522) | ($9,891) | ($3,774) |
| PRC/Ft. Collins | (1,974) | (252) | (11) |
| PRC/Boulder | (1,491) | (42,707) | 88 |
| PRC/Denver | (29,752) | (58,084) | (373) |
| Properties | N/A[12] | (40,985) | (6,334) |

Because of the financial problems that were developing during the summer of 1975, petitioners decided to sell something. Mesa could not be sold because of the above-described operational problems. The PRC Group could not be sold because of the effect of the recession on the waste paper market. Petitioners decided to sell Urban's assets in order to raise money that could be used to ease the cash-flow problems that Mesa and the PRC Group were experiencing.

On August 20, 1975, an agreement (hereinafter sometimes referred to as the Urban sales contract) was entered into pursuant to which Kean and Urban agreed to sell virtually all of Urban's assets to Landfill, Inc. (hereinafter sometimes referred to as Landfill), a wholly owned subsidiary of Browning-Ferris Industries, Inc. The Urban sales contract required Landfill to pay to Urban the following consideration: (1) $287,500 in cash to be paid at closing and (2) a maximum payment of $50,000 to be paid at a maximum rate of $10,000 per year for the 5 years following the closing date.[13] In addition, Urban and Kean agreed to a covenant not to compete that precluded them from entering into the solid waste disposal business, within 100 miles of Urban's principal place of business, for 5 years after the date of closing. Included among the assets to be sold was the lease relating to the south tract; however, Urban and Kean declined to sell the lease relating to the 320-acre tract because, upon the expiration of the 5-year covenant not to compete, petitioners hoped to continue their landfill business in this area which was already zoned by Boulder

---

[11]PRC/Ft. Collins' 1976 tax return shows no income and no deductions.

[12]Properties' information returns show that it began business on Aug. 15, 1974, but the record does not show the amount of Properties' 1974 ordinary income or (loss).

[13]These amounts were to be calculated using a formula set forth in the Urban Sales Contract which considers the amount of refuse brought to the south tract by commercial refuse haulers who had contracts with Urban at the time of the sale of the assets, which contracts were to be assigned to Landfill.

County for solid waste disposal. Of the total $337,500 consideration, the parties to the contract allocated $305,000 to the lease relating to the south tract and $32,500 to certain tangible assets. Nothing was allocated to the covenant not to compete. Finally, the Urban sales contract was conditioned on (1) Urban's obtaining its shareholders' approval thereof[14] and (2) Landfill and Mesa's executing an agreement with respect to Mesa's gravel mining operations on the south tract. The Urban sales contract also permitted Urban to accept and dispose of any trash or other waste material, including waste paper products, brought to the south tract by third parties. This provision would enable the PRC Group to continue its resource recovery work.

Although Urban intended to renew its landfill operations on an 80-acre tract adjacent to and south of the south tract, Urban's tax counsel advised petitioners to have the corporation liquidated under section 337. Accordingly, on September 26, 1975, Urban's shareholders approved the Urban sales contract and adopted a plan of complete liquidation pursuant to section 337 (hereinafter sometimes referred to as the liquidation plan).[15] Pursuant to the liquidation plan, the proceeds from the sale of the corporate assets, and any unsold assets, were to be distributed pro rata to Urban's shareholders after the payment of corporate debts.[16]

The Urban sales contract was closed on September 30, 1975. In connection with this closing, the lessors of the south tract had executed on September 25, 1975, an acknowledgment and consent to the assignment of the lease from Urban to Landfill, to be effective September 30, 1975. Also, Mesa and Landfill entered into a contract and agreement, effective September 30, 1975, pursuant to which the parties thereto agreed that Mesa and Landfill would continue to conduct gravel mining and landfill operations on

[14]The Urban sales contract required a favorable vote of two-thirds of Urban's stock.

[15]The parties have stipulated that Urban adopted the Liquidation Plan on Sept. 26, 1975. The tax return for Urban's taxable year 1975 states that the Liquidation Plan was adopted on Sept. 28, 1975. This difference, which the parties do not explain, is immaterial for our purposes.

[16]The liquidation plan contemplated (1) the sale of assets under the Urban sales contract; (2) the sale of other assets having a "book value" of $237,831; (3) the use of proceeds of these sales to pay "total liabilities of $359,420", as well as costs of sale before any distribution to shareholders; and (4) the existence of other assets having a "book value" of $69,549.

the south tract in accordance with the Black & Veatch report after Urban's assignment of the lease to Landfill.

In March 1976, after the payment of certain of its debts, Urban was liquidated, pursuant to the liquidation plan, and assigned its remaining assets to a liquidating trust (hereinafter sometimes referred to as the trust) created by Urban's shareholders, with the National State Bank of Boulder as the trustee (hereinafter sometimes referred to as the trustee). Immediately before the liquidation, Urban owned the following assets: various real and personal properties used in Urban's landfill operation, stock in Salvage, Inc. (one of Urban's shareholders, hereinafter sometimes referred to as Salvage), notes receivable from Superior Products Corp. in the total amount of $13,384, miscellaneous accounts receivable (see tables 5 and 6, *infra*), and Landfill's contractual obligation to pay Urban a maximum amount of $50,000, pursuant to the Urban sales contract.[17] This last item constituted Urban's primary remaining asset; most of the other assets that were assigned to the trust had no value and subsequently were abandoned. Under the trust agreement, the trustee was required to distribute pro rata to Urban's shareholders any payments received from Landfill in accordance with the Urban sales contract.

In October 1976, the trustee received about $9,900 from Landfill as the first year's installment under the Urban sales contract. Contrary to the trust agreement's terms, but pursuant to Kean's instructions as president of Urban, the trustee used most of those proceeds to make the payments shown in table 4.[18]

---

[17]The parties have stipulated to the transfer of all of the foregoing listed assets to the trust. However, the stipulated trust agreement provides only for the transfer of Urban's interest in the Urban sales contract and the trustee's obligations with regard to the payments it was to receive under that contract. The parties have not reconciled the stipulation and the exhibit. Our findings are in accordance with the parties' stipulations, and not in accordance with the stipulated exhibit.

[18]Petitioners understood that the trust agreement required the trustee to pay any additional debts of the corporation before distributing the proceeds from the Urban sales contract to Urban's shareholders pro rata. The trust agreement does not impose any such requirement on the trustee. Specifically, the trust agreement provides as follows:

*Section 2-1.* Upon receipt by the Trustee of part or all of the payments due under the [Urban Sales] Contract, the Trustee shall immediately take steps necessary to distribute the contractual payments to the Shareholders. Each payment so received shall be distributed to the Shareholders in the following proportions * * *.

\* \* \* \* \* \* \*

TABLE 4

| Payee | Amounts |
|---|---|
| Landfill | $3,776.25 |
| Roath & Brega, P.C.—attorneys' fees | 456.00 |
| Bickell & Meyer—accounting fees | 1,000.00 |
| City Electric Co. | 1,550.22 |
| Small Business Association—loan payment (discussed *infra*) | 2,000.00 |
| J.K. Lasser & Co.—accounting fees | 1,045.00 |
| Total | 9,827.47 |

On October 6, 1977, Urban reassigned the proceeds of the Urban sales contract to the County of Boulder to satisfy Urban's delinquent personal property taxes in the amount of $13,348.78. Pursuant to that assignment, payments in the amounts of $1,602.40 and $8,412.33 were made in October 1977 and October 1978, respectively.[19]

Pursuant to Urban's reassignment of the proceeds from the Urban sales contract to the Small Business Association (hereinafter sometimes referred to as the SBA), discussed, *infra*, Landfill made two payments directly to the SBA, the first on October 26, 1979, in the amount of $7,136.75, and the second on February 11, 1981, in the amount of $7,811.29, for a total of $14,948.04. In addition, as noted in table 4, *supra*, the trustee had used $2,000 of Landfill's October 1976 payment to pay the SBA.

Thus, neither Kean nor Gray ever received directly any of the proceeds under the Urban sales contract relating to Landfill's contingent contractual obligation to pay Urban up to $50,000 over 5 years. The only asset Kean directly received from the trust was a Scout pickup truck for which Kean had to pay $900 for repairs and continue the loan payments thereon. Gray did not directly receive any of Urban's assets from the liquidation.[20]

*The SBA loan.*

On or about May 20, 1966, Colorado Composting & Disposal Corp. (hereinafter sometimes referred to as Colo-

---

*Section 2-3.* Under no circumstances shall any portion of the funds received by the Trustee as payment under the Contract be returned to the Corporation [i.e., Urban], regardless of whether or not the Corporation has been dissolved under state law.

[19]The record in the instant cases does not disclose what happened to the remaining $3,334.05 delinquent property taxes owed to the County of Boulder. In any event, the Urban sales contract became available for reassignment in 1979.

[20]Both Kean and Gray had loaned to Urban, Mesa, and the PRC Group significant sums of money that were never repaid.

rado Composting) executed and delivered to the Mercantile Bank & Trust Co. of Boulder, Colorado, a promissory note in the amount of $116,600 (hereinafter sometimes referred to as the Mercantile note),[21] which Rich-Land guaranteed. On or about July 14, 1967, the Mercantile note was assigned to the SBA. Colorado Composting defaulted on the Mercantile note and the United States brought suit on behalf of the SBA against Colorado Composting, Rich-Land, and several other persons. The litigation was settled and, pursuant to a stipulation and agreement filed on December 16, 1971, it was agreed that Salvage would pay $55,000 to the SBA in settlement of the claims against Colorado Composting, et al. As part of the settlement, Salvage was to give to the SBA two promissory notes, one for $35,000 and one for $15,000 (hereinafter sometimes referred to as the Salvage notes). Petitioners and certain other persons were required to guarantee payment of the Salvage notes. The Salvage notes were not timely paid. On February 9, 1977, petitioners, as guarantors, offered to compromise their liabilities by paying to the SBA $4,600 plus any interest outstanding. The SBA did not accept this offer. Instead, the United States brought suit on behalf of the SBA against petitioners to collect on their 1971 personal guarantees of the Salvage notes. In settlement of this suit in 1979, (1) Urban assigned certain contract rights to the SBA including the proceeds from the Urban sales contract (see discussion about the 1977 assignment, *supra*), and (2) Kean agreed to be personally liable to the extent that the proceeds from the above assignment were less than $20,000;[22] Gray was not to be liable for any shortfall.

*Urban's transfers and claimed bad debts.*

On Urban's tax return for its taxable year 1975, Urban took a bad debt deduction of $102,762. The components of

---

[21]The parties' stipulation and proposed findings of fact all state that the note was for $116,000. However, the parties stipulated to an exhibit which describes the note and has a photocopy of the note as an attachment. The photocopy of the note plainly shows it as being for "One Hundred Sixteen Thousand, Six Hundred & no/100 Dollars", and the exhibit's description of the note also shows it as $116,600. Our finding is in accordance with the exhibit and not the parties' stipulation.

[22]We have found that Landfill's payments to the SBA totaled $14,948.04. The record in the instant cases does not disclose what happened to the remaining $5,051.96 that was guaranteed by Kean.

this deduction are set forth in table 5. On Urban's tax return for its taxable year 1976, Urban took a bad debt deduction of $61,445. The components of this deduction are set forth in table 6.

TABLE 5

| Date[23] | Payee | Purpose | Amount |
|---|---|---|---|
| 7/31/75 | First National Bank, (hereinafter sometimes referred to as First National) | Retire loan owed by Mesa to First National | $18,322 |
| 8/21/75 | PRC/Denver | Payment on loan made by Security National Bank of Denver, Colorado (hereinafter sometimes referred to as Security National), to PRC/Denver, as guaranteed by Kean | *30,000 |
| 8/21/75 | PRC/Boulder | Payment on loan made by Security National to PRC/Boulder, as guaranteed by Kean | *20,000 |
| 8/21/75 | Properties | Payment on loan made by Security National to Properties | 2,723 |
| 8/21/75 | PRC/Boulder | Payment of interest on loan made by Security National to PRC/Boulder, as guaranteed by Kean | *194 |
| 8/21/75 | PRC/Denver | Payment of interest on loans owed to Security National by PRC/Denver, as guaranteed by Kean | *915 |
| 9/30/75[24] | Mesa | Disbursements shown in Urban's disbursement journal during Urban's taxable year 1975 to or on behalf of Mesa | 38,030 |
| 9/30/75 | Mesa and PRC | Other debits to Urban's accounts payable journal | 8,760 |

[23]It is not clear whether the stipulated "7/31" and "9/30" dates are intended to refer to events that occurred on those dates or to events that occurred during July and September, respectively, and were posted to certain of Urban's books on those dates. See note 24 and discussion of the $18,322 payment, in the text immediately after table 6, *infra.*

[24]This figure does not represent a transfer made on Sept. 30, 1975, but rather represents a culmination of the transfers made throughout the entire year.

| Date | Payee | Purpose | Amount |
|------|-------|---------|--------|
| 9/30/75 | Vendors related to Mesa | Operating expenses | $17,633 |
| | | | 136,577 |
| 9/30/75[25] | Mesa | Credit to Urban accounts payable journal offsetting transfers to Mesa | (24,110) |
| 9/30/75 | Mesa and PRC | Other credits to Urban accounts payable journal | (8,760) |
| | | Items not deducted | (945) |
| Amount deducted | | | 102,762 |

*These items, totaling $51,109, constitute transfers that, respondent contends, give rise to Kean's transferee liability. See also table 6, *infra*, and table 7, *infra*.

## TABLE 6

| Date | Payee | Purpose | Amount |
|------|-------|---------|--------|
| 10/75 | Mesa | Pay bank overdraft | $1,630.00 |
| 10/75 | Mesa | Pay trade payable owed to Faris Machinery | 1,028.43 |
| 10/75 | Mesa | Pay payroll tax deposit | 2,673.43 |
| 10/75 | Mesa | Pay trade payable owed to H.W. Moore | 1,354.32 |
| 10/75 | Mesa | Pay lease payment owed to Associated Capital | 580.00 |
| 10/75 | Mesa | Pay trade payable owed to General Leasing | 50.20 |
| 10/75 | Mesa | Credit for refund on insurance policy | (136.85) |
| 10/75 | Mesa | Credit for gravel provided | (10,324.75) |
| 10/75 | PRC/Denver | Pay payroll taxes | 6,098.85 |
| 10/75 | PRC/Denver | Pay trade payable owed to C.T. Main | 5,044.00 |
| 10/75 | PRC/Boulder | Pay trade payable to Western Foundry | 190.00 |
| 10/75 | Properties | Pay trade payable owed to Navaho Freight | 150.00 |
| 10/75 | Properties | Credit for refund on insurance policy | (1,277.60) |

[25]See note 24, *supra*. The $24,110 consists of six checks from Mesa to Urban, each of which was deposited by Urban on the same day that the check is dated, as follows:

| Check No. | Date | Amount |
|-----------|------|--------|
| 1109 | Sept. 16, 1975 | $1,060 |
| 1113 | Sept. 24, 1975 | 1,000 |
| 1114 | Sept. 24, 1975 | 1,500 |
| 1119 | Sept. 25, 1975 | 14,000 |
| 1120 | Sept. 25, 1975 | 750 |
| 1126 | Sept. 26, 1975 | 5,800 |

| Date | Payee | Purpose | Amount |
|------|-------|---------|--------|
| 11/75 | Properties | Pay National State Bank note | $7,753.66 |
| 11/75 | Mesa | Pay principal and interest on National State Bank note, as guaranteed by Kean and Gray | *11,851.56 |
| 12/75 | Mesa | Pay off National State Bank note, as guaranteed by Kean and Gray[26] | *31,922.63 |
| 12/75 | Mesa | Pay to Gray the proceeds from sale of fuel truck | 168.48 |
| 12/75 | Properties | Transfer used conveyer to Properties | 3,000.00 |
| 12/75 | Properties | Credit for transfer of proceeds from sale of van, applied to trade payable account | (1,500.00) |
| 12/75 | Properties | Pay for moving balers | 447.83 |
| 12/75 | Properties | Pay for conveyer and moving charges | 2,168.81 |
| | | Credits not accounted for | (1,076.83) |
| Amount deducted (rounded total) | | | 61,445.00 |

*These items, totaling $43,774.19, constitute transfers that, respondent contends, give rise to Kean's and Gray's transferee liabilities. See also table 5, *supra,* and table 7, *infra.*

In July 1975, Urban borrowed $23,000 from First National. It was contemplated that (1) Urban would use $18,000 of the loan proceeds to repay Kean that amount which was owed to him;[27] (2) Kean would lend the $18,000 to Mesa; (3) Mesa would use the $18,000 to repay part of a $25,000 loan it owed to First National; (4) the remaining $7,000 of the $25,000 loan owed by Mesa would be secured by Mesa's receivables of $7,100; and (5) Urban would repay the $23,000 loan to First National on October 3, 1975, from the proceeds of the Urban sales contract that was scheduled to close on September 30, 1975. However, the transaction actually occurred in a somewhat altered form. That is, on July 7, 1975, loan proceeds of $23,000 (less a $2 filing fee)

---

[26]So stipulated. We note that the guarantees show that the National State Bank assigned the note to Kean and Gray on Feb. 10, 1981. The record does not disclose why it would have taken more than 5 years after the guaranteed obligation had been "paid off" for the National State Bank to assign the guarantees.

[27]At the time Mesa was organized, the Board of Directors had resolved that, as soon as funds became available, Kean would be paid $18,000 for services rendered.

were deposited in Urban's account at First National. On that same date (see note 23, *supra*), Urban made a payment on the loan Mesa owed to First National in the amount of $18,321.92 (i.e., $18,000 in principal and $321.92 in interest). (See first item in table 5, *supra.*)

On August 21, 1975 (the day after the Urban sales contract was executed and about 1 month before Urban's shareholders approved the Urban sales contract and adopted the liquidation plan), Urban borrowed $113,275.09 from Security National (this loan is hereinafter sometimes referred to as the Security National loan). The repayment of the Security National loan was secured by the Urban sales contract among other things. The Security National loan was to be for a term of 41 days and was to accrue interest in the amount of $1,193.51 (9.38 annual percentage rate). Thus, on October 1, 1975, the day after the Urban sales contract was scheduled to close, the Security National loan was to be repaid in the total amount of $114,468.60.[28] This repayment was guaranteed by Kean. The proceeds of the Security National loan were used by Urban, in part, to make certain of the payments shown in table 5. In particular, a total of $51,109 was paid by Urban on August 21, 1975, to satisfy principal and interest on loans owed by PRC/Denver and PRC/Boulder, as guaranteed by Kean, the items which are shown by asterisks on table 5, *supra.*

While Urban was making transfers to or on behalf of Mesa and the PRC Group through September 1975, these latter entities were experiencing serious financial problems, discussed *supra*, that caused Mesa to sell off much of its assets and the PRC Group to cease, or fail to begin, some of its operations. In addition, Mesa and the PRC Group had difficulty repaying certain loans they had at various financial institutions.

On or about February 28, 1977, Urban filed its tax returns for its taxable years 1975 and 1976. These tax returns were prepared by Renae Kofford (hereinafter sometimes referred to as Kofford), an accountant. Kofford was

---

[28]In a stipulated exhibit, the parties describe the Security National loan as "a loan from Security National in the amount of $114,469." This is the sum of the principal and interest. Our findings are based on the text of the promissory note itself, also an exhibit in these cases, rather than on the parties' characterization.

also responsible for preparing Mesa's and PRC's tax returns for at least part of this period.

In preparing Urban's tax returns for its taxable year 1976, Kofford first had to make entries in Urban's ledgers and journals to reconstruct the events that occurred during the period October 1, 1975, through September 30, 1976. She used original documentation kept by Urban in posting Urban's books of account. Because entries had been made in Urban's ledgers and journals through September 30, 1975, Kofford did not have to reconstruct Urban's books in preparing its tax returns for taxable year 1975. The bad debt deductions in dispute in the instant cases were based on open accounts, which in turn were supported by invoices.

Having worked. for Kean from mid-1973 to mid-1974, Kofford was aware of the interrelationship among Urban, Mesa, and the PRC Group. Kofford, using hindsight, deducted some of Urban's transfers as bad debts for Urban's taxable year 1975 (even though she concluded that they were not yet worthless as of September 30, 1975), because it appeared to her in 1977 that it was obvious that the transfers were not going to be repaid.[29] She did this to avoid deducting such transfers as bad debts for Urban's taxable year 1976 and carrying back any excess net operating loss resulting therefrom to taxable years 1974 and 1975 (see note 2, *supra*), even though she believed that it would have been, technically, correct to deduct the bad debts for Urban's taxable year 1976.

---

The transfers from Urban to or on behalf of Mesa and the PRC Group in taxable years 1975 and 1976 did not give rise to bona fide debt.

Kean caused Urban to make payments on debts owed by Mesa, the PRC Group, and Salvage, for which Kean and (in some instances) Gray were secondarily liable as guarantors. The transfers were made so that Kean could avoid liability on his guarantees. Gray's benefit merely was a consequence of Kean's benefit.

---

[29]That is, Kofford determined that, since Mesa was dormant in September 1975 and PRC had ceased operations in the spring of 1976, the intercompany transfers reflected on Urban's records as accounts receivable had become worthless since no payments were or would be made thereon.

OPINION

Respondent contends that Urban improperly deducted $102,762 and $61,445, on its tax returns for its taxable years 1975 and 1976, respectively, as bad debts under section 166(a) because Urban's transfers to or on behalf of Mesa and the PRC Group did not give rise to bona fide debts. Moreover, respondent contends that Urban was left without sufficient assets to pay the income tax deficiency that resulted, in part, from respondent's disallowance of the bad debt deductions when it made transfers to or on behalf of Mesa and the PRC Group. Because these transfers were used to pay certain liabilities of Mesa and the PRC Group that were guaranteed by Kean and Gray, respondent would hold petitioners liable as transferees of Urban under section 6901 for the deficiency determined against Urban for its taxable year 1975.

Petitioners contend that the transfers from Urban to or on behalf of Mesa and the PRC Group gave rise to bona fide debts, that these debts went bad in Urban's taxable years 1975 and 1976, and so the bad debts are deductible for these taxable years under section 166(a).[30] Petitioners assert that even if the Court determines that the transfers did not give rise to bona fide indebtedness, neither Kean nor Gray are liable as transferees of Urban merely because the transfers were used to pay liabilities of Mesa and the PRC Group, some of which Kean and Gray had personally guaranteed.

We agree with respondent as to the bad debt issue and as to transferee liability against Kean. We agree with petitioners as to transferee liability against Gray.

## I. Bad Debt Deductions

Section 166(a)[31] allows deductions for worthless debts.

---

[30]Petitioners assert alternatively that the $102,762 that it deducted for its taxable year 1975 became worthless in its taxable year 1976 and is therefore deductible as a bad debt for Urban's taxable year 1976.

[31]SEC. 166. BAD DEBTS.

(a) GENERAL RULE.—

(1) WHOLLY WORTHLESS DEBTS.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

(2) PARTIALLY WORTHLESS DEBTS.—When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part

Petitioners do not claim that Urban's debts are deductible as partially worthless debts (sec. 166(a)(2)), and so we consider whether they are deductible as wholly worthless debts (sec. 166(a)(1)).

A debt is deductible under section 166(a)(1) only for the year in which it becomes wholly worthless. *Dustin v. Commissioner*, 53 T.C. 491, 501 (1969), affd. 467 F.2d 47, 48 (9th Cir. 1972). Also, only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises under a debtor-creditor relationship based on a valid and enforceable obligation to pay a fixed or determinable sum of money. A gift or contribution to capital is not considered to create a debt for purposes of section 166. *Matter of Uneco, Inc.*, 532 F.2d 1204, 1207 (8th Cir. 1976); *Wortham Machinery Co. v. United States*, 521 F.2d 160, 164 (10th Cir. 1975); sec. 1.166-1(c), Income Tax Regs.

We must decide whether Urban is entitled to a bad debt deduction under section 166(a)(1) for the unpaid balance of non-interest-bearing "open account" transfers to or on behalf of related companies, most of which transfers were made during the last 4½ months of 1975. The resolution of this question turns on the proper characterization of the transfers, petitioners contending that they represent bona fide debts and respondent disagreeing, asserting that the advances were made without reasonable expectation of repayment.

Our focus is directed to a determination of the true nature of the financial arrangement among Urban, Mesa, and the PRC Group. The decided cases considering the question whether a purported debt is in fact a debt for tax purposes set forth various tests and criteria; in the final analysis, however, the question depends on the facts and circumstances of each case, with the taxpayer bearing the burden of proof. E.g., *Segel v. Commissioner*, 89 T.C. 816, 826-827 (1987), and cases cited therein; *Malone & Hyde, Inc. v. Commissioner*, 49 T.C. 575, 578 (1968). We must examine the facts before us in light of "the realities of the business world and the manner in which transactions are handled in

charged off within the taxable year, as a deduction.

[The subsequent amendment of this provision by sec. 1906(b)(13) [sic] (A) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1834, does not affect the instant cases.]

the normal and ordinary course of doing business." *Malone & Hyde, Inc. v. Commissioner, supra.* However, we recognize that the relationships among Urban, Mesa, and the PRC Group "are subject to particular scrutiny 'because the control element suggests the opportunity to contrive a fictional debt.' " *Matter of Uneco, Inc.,* 532 F.2d at 1207, citing *Cuyuna Realty Co. v. United States,* 180 Ct. Cl. 879, 883-884, 382 F.2d 298, 300-301 (1967). See *Canaveral International Corp. v. Commissioner,* 61 T.C. 520, 543-544 (1974).

The following considerations cause us to conclude that the transfers by Urban to or on behalf of Mesa or the PRC Group did not give rise to bona fide debts by Mesa or the PRC Group to Urban; rather, the transfers were made to benefit Kean, whose controlling presence was on all sides of the negotiating table:

(1) There were no documents evidencing obligations to repay, other than the vouchers and the open accounts, and no documents or express understandings regarding security, time for repayments, or obligation to pay interest.

(2) All of the transfers (except the July 31, 1975, transfer to First National (table 5, *supra*) and some undisclosed part of the transfers described in note 24, *supra*) were made after August 20, 1975, when the Urban sales contract was entered into, and about 40 percent of the transferred amounts were transferred after September 26, 1975, when the liquidation plan was formally adopted. (Tables 5 and 6, *supra*.)

(3) Many of the transfers were made in order to pay obligations that had been guaranteed by Kean. (See asterisked items in tables 5 and 6, *supra*.)

(4) When the transfers were made, the payees (or the entities on whose behalf the payments were made) were in such straitened circumstances as to make it unlikely that the transfers would be repaid.

We examine these considerations seriatim.

*Lack of documents and agreements*

The lack of formal debt instruments and of agreements as to security, time for repayment, and obligation to pay interest, is significant—although by itself not conclusive—

evidence that the transfers did not give rise to bona fide debts. *Road Materials, Inc. v. Commissioner*, 407 F.2d 1121, 1123 (4th Cir. 1969), affg. a Memorandum Opinion of this Court;[32] *Clark v. Commissioner*, 18 T.C. 780, 783 (1952), affd. 205 F.2d 353 (2d Cir. 1953). The open accounts maintained by Urban and the other entities do not require a different result. *Road Materials, Inc. v. Commissioner*, 407 F.2d at 1124. As we said in *Kaplan v. Commissioner*, 59 T.C. 178, 186 (1972), "Neither formal use of notes or debentures nor the making of appropriate book entries can substantively convert a capital contribution into a valid indebtedness. * * * However, the petitioner's *failure* to follow form is certainly evidence that the advances were not intended to be debt." (Citations omitted; emphasis in original.) Kean, when asked why interest was not charged on these open accounts, testified as follows:

I guess the feeling at the time, and I can't even recall that question coming up, but again, I was a major stockholder, Mr. Gray was the other major stockholder, and it, to use the expression, it would come out in the laundry, I mean it would wash out both ways, the interest.

As appears from table 1, *supra*, Kean himself could vote a majority interest in Urban, Mesa, and each of the entities in the PRC Group. The record-keeping system and Kean's testimony suggest a concern for moving funds among the entities to serve the interests of their common owner rather than those of the individual entities. See *Gilbert v. Commissioner*, 74 T.C. 60, 65-66 (1980).

*Timing.*

Petitioners contend that Urban had a bona fide business purpose for making loans to Mesa and the PRC Group. Kean testified that the entities were economically interrelated and that the success or failure of one entity had a beneficial or adverse effect on the other entities. Moreover, both Kean and Smith testified that transfers were made to alleviate cash-flow problems the companies were experiencing and to keep the companies operational. However, the Urban sales contract was entered into on August 20, 1975, and the

---

[32]T.C. Memo. 1967-187. The case was remanded only to consider an issue that had been raised for the first time on appeal. 407 F.2d at 1125.

liquidation plan was adopted on September 26, 1975. By the former date, it was clear that Urban was going out of business for a substantial period, and by the latter date, it was clear that Urban was shortly to go out of existence, not merely out of business. Yet an examination of tables 5 and 6 makes it clear that about 40 percent of the claimed bad debts arose after Urban's shareholders had formally approved the liquidation plan and that almost all of the claimed bad debts arose after the Urban sales contract had been entered into. On the basis of the record in the instant cases, we do not believe that Urban's decision-makers thought that Urban would benefit by transferring funds to either Mesa or the PRC Group at a time when Urban was liquidating and winding up its affairs. In other words, since Urban was going out of business, presumably it would no longer be concerned about Mesa's and the PRC Group's cash-flow problems because Urban would no longer be economically related to the other entities. Thus, it appears that the transfers were made not to benefit Urban, but to benefit Kean as controlling shareholder of Mesa and the PRC Group. That is, since Mesa and the PRC Group were to continue in existence in the meantime, Kean, as the controlling shareholder, had an interest in seeing to it that the debts of these entities could be repaid without Kean's being called on to satisfy his guarantees.

Petitioners give much weight to our opinion in *Johnson v. Commissioner*, T.C. Memo. 1977-436. Petitioners point out that we held in *Johnson* that advances by one corporation to another corporation were made for the business purposes of the transferor corporation, were properly treated as loans rather than contributions to capital, and were not properly treated as constructive dividends to the common shareholders. *Johnson* is distinguishable on its facts. In the instant cases, the transferor was about to go out of business; in *Johnson,* the transferor was continuing in business. In *Johnson,* the transfers were made pursuant to an agreement with an unrelated party that controlled the transferee; in the instant cases, the transferor was not obligated to make the transfers, and the person who controlled the transferee was Kean, the same person who controlled the transferor. In the instant cases, the transfers were made largely to pay

off debts personally guaranteed by Kean; in *Johnson*, it does not appear that the common shareholders derived any such individual benefits from the transfers. Thus, *Johnson* merely illustrates the weakness of petitioners' contentions in the instant cases.

*Guaranteed debts.*

As is clear from tables 5 and 6, *supra*, well over half of the transfers that gave rise to the claimed bad debts (the $94,883.19 of asterisked items out of a total of $164,207 claimed bad debts) were made for the purpose of enabling the transferee entities to pay obligations that had been guaranteed by Kean (one-fourth of the total involved loans where Gray was a coguarantor with Kean).[33] We accept as true petitioners' contentions that such shareholder guarantees are common. However, it also appears that the point of Urban making these transfers was not to benefit Urban in any non-tax way (Urban was going out of business and was not even charging interest on these "loans") but rather to get the guaranteed debts paid, or capital contributions made, without running the funds through the income of Urban's shareholders, chiefly Kean. Indeed, as is shown by our findings regarding Urban's July 1975 borrowing from First National (see note 27 and the related text, *supra*), Urban avoided paying its own debt to Kean, apparently in order to achieve Kean's objectives without his having to recognize compensation income (see note 27 and accompanying text, *supra*).

*Expectation of repayment.*

Finally, we must evaluate whether, under the particular facts and circumstances of the instant cases, there was a reasonable expectation of repayment in light of the economic realities of the situation. *Arrigoni v. Commissioner*, 73 T.C. 792, 799 (1980). Our conclusion that Urban did not have a reasonable expectation of repayment is based on the record, which clearly reflects the precarious financial condition of both Mesa and the PRC Group at the time most of

---

[33]This is in addition to the payments on the SBA loan, which do not directly relate to the bad debt deductions but which are of significance in understanding the purposes of Urban's activities. The SBA loan is discussed *infra.*

the transfers were made. By September 1975, Mesa had sold off most of its assets and could sell only pit run, which it did to a limited extent. Although Mesa hoped to salvage its business by making a contract for the sale of pit run to be used in the Colorado State Highway Department's construction of the 47th Street Bypass, negotiations for this contract never came to fruition. Mesa never did any gravel mining or processing after September 1975. As shown in table 2, *supra*, Mesa's tax returns for the fiscal years ended August 31, 1974, through August 31, 1976, reflect substantial losses.[34] With regard to the PRC Group, we have previously described the serious financial problems it began to experience because of the effect of the economic recession on the paper products industry and because its principal customer, Victor Mill, failed to pay its bills in accordance with its contract. Eventually, Victor Mill totally breached its contract with PRC. By August 1975, the PRC/Denver paper processing plant was shut down. PRC/Ft. Collins never started its operation. By the spring of 1976, the PRC Group had ceased its remaining operations altogether. As is shown in table 3, *supra*, the tax returns for the members of the PRC Group also reflect the fact that for 1974 through 1976 most of the members of the PRC Group incurred losses or, in one instance, reported an inconsequential amount of income.

Thus, even if we were to ignore the use of the transferred amounts for the benefit of Kean as guarantor,[35] we would have to conclude that the transferred amounts were put at the risks of the transferees' businesses, that these risks were substantial and were not to be compensated for by appropriate rates of interest, and accordingly that the transfers were risk capital, rather than loans. *Funk v. Commissioner*, 35 T.C. 42, 50 (1960).

---

[34]In fact, the only year for which Mesa reported income was its fiscal year ending Aug. 31, 1977, when it reported $95,233 of discharge of indebtedness income from Urban's cancellation of Mesa's debt. See note 10, *supra*.

[35]Our references to Kean's or Gray's guarantees should not obscure the fact that the disputed deductions are those claimed by Urban and not deductions that might have been claimed by petitioners if Urban's transfers had been made to petitioners and petitioners had then used the transferred amounts to pay the obligations that petitioners had guaranteed. In the latter situation, we would look to the likelihood of repayment as of the time the guarantee agreements were entered into. In the instant cases, however, we look to the likelihood of repayment when the transfers were made. This distinction is explained in *Arrigoni v. Commissioner*, 73 T.C. 792, 799-800 (1980). See *Wortham Machinery Co. v. United States*, 521 F.2d 160, 164 (10th Cir. 1975).

*Miscellaneous*

The record shows that Mesa was credited on account of repayments aggregating $24,110 (table 5 and note 25, *supra*).[36] The record does not indicate why Mesa paid the $24,110 to Urban when it did, especially since table 6 shows that shortly afterward Urban paid more than $50,000 of Mesa's debts (offset by a $10,324.75 credit).[37] The $10,324.75 Mesa credit is shown as "10/75 * * * credit for gravel provided". In addition, the record shows three small credits ($136.85, $1,277.60, and $1,500) for Mesa and Properties.

These credits lend some support to petitioners' contention that Urban's transfers may properly be viewed as loans. However, on balance, the record inclines strongly against a conclusion that the transfers gave rise to debts owed to Urban, and we have found that they did not.[38]

We hold for respondent on this issue.

## II. Transferee Liability

Respondent has determined, under section 6901,[39] that petitioners are liable as transferees for Urban's 1975 income

---

[36]In addition, offsetting credits and debits of $8,760 are described in the parties' stipulated exhibit as "other credits" and "other debits". See table 5, *supra*.

[37]Urban claimed the disputed bad debt deductions on its 1975 and 1976 tax returns that it filed on or about Feb. 28, 1977. Mesa reported corresponding cancellation of indebtedness income on its 1977 tax return, but did not file this tax return until March 1982. (See note 10, *supra*.) Since there was common ownership, control, and staffing, a question arises as to why there was this 4-year delay in filing Mesa's tax return. Petitioners have not clarified this matter; it is one of many puzzling aspects of these cases. See, e.g., notes 17, 19, 22, 26, *supra*, and note 40, *infra.*

[38]Neither side suggests that we might allow Urban's bad debt deductions in part and disallow them in part. The record does not appear to present a sound basis for differentiated treatment.

[39]Sec. 6901 provides, in pertinent part, as follows:

SEC. 6901. TRANSFERRED ASSETS.

(a) METHOD OF COLLECTION.—The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred:

(1) INCOME, ESTATE, AND GIFT TAXES.—

(A) TRANSFEREES.—The liability, at law or in equity, of a transferee of property—

(i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes),

in respect of the tax imposed by subtitle A * * * .

\* \* \* \* \* \* \*

(b) LIABILITY.—Any liability referred to in subsection (a) may be either as to the amount of tax shown on a return or as to any deficiency or underpayment of any tax.

tax deficiency. Section 6901 does not in and of itself create liability in a transferee, but rather provides a procedural mechanism by which respondent may pursue against a transferee a claim for the tax liability of a transferor. *Phillips v. Commissioner*, 283 U.S. 589 (1931). The existence and extent of the transferee's liability is determined under applicable State law (*Commissioner v. Stern*, 357 U.S. 39, 42-45 (1958))—in the instant cases, Colorado law. Respondent has the burden of proving the elements necessary to establish petitioners' liabilities as transferees.[40]

Table 7 shows transfers by Urban to pay off debts that had been guaranteed by one or both of the petitioners.

TABLE 7

| Date | Payee | Purpose | Amount |
|------|-------|---------|--------|
| 8/21/75 | PRC/Denver | Payment on loan made by Security National to PRC/Denver, as guaranteed by Kean | $30,000.00 |
| 8/21/75 | PRC/Boulder | Payment on loan made by Security National to PRC/Boulder, as guaranteed by Kean | 20,000.00 |
| 8/21/75 | PRC/Boulder | Payment of interest on loan made by Security National to PRC/Boulder, as guaranteed by Kean | 194.00 |
| 8/21/75 | PRC/Denver | Payment of interest on loans owed to Security National by PRC/Denver, as guaranteed by Kean | 915.00 |
| 11/75 | Mesa | Pay principal and interest on National State Bank note, as guaranteed by Kean and Gray | 11,851.56 |

---

[40]Before the trial, but after the petitions were filed in the instant cases, Kean, after seeking advice from his accountant, authorized the destruction of the PRC Group's books and records, believing that the information contained therein was not relevant to the instant cases. As a result, this material could not be produced at trial. The Court granted in part respondent's motion to impose sanctions for petitioners' failure to produce these records—i.e., petitioners have the burden of proving, with respect to the issue regarding their transferee liability, that no distributions were made to them from the PRC Group. On all other aspects of the transferee liability issue, the burden of proof remains with respondent. Sec. 6902(a); *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(d). Our determinations have been made on the basis of the preponderance of the evidence; accordingly it is immaterial, in the instant cases, who bears the burden of proof. *Deskins v. Commissioner*, 87 T.C. 305, 323 n. 17 (1986).

Unless indicated otherewise, all Rule references are to the Tax Court Rules of Practice and Procedure.

| Date | Payee | Purpose | Amount |
|------|-------|---------|--------|
| 12/75 | Mesa | Pay off National State Bank note, as guaranteed by Kean and Gray | $31,922.63 |
| 10/76 | SBA | Payment on Salvage Notes, as guaranteed by Kean and Gray | 2,000.00 |
| 10/26/79 | SBA | Payment in settlement of suit on Salvage Notes; notes guaranteed by Kean and Gray, settlement guaranteed by Kean | 7,136.75 |
| 2/11/81 | SBA | Payment in settlement of suit on Salvage Notes; notes guaranteed by Kean and Gray, settlement guaranteed by Kean | 7,811.29 |

In addition, respondent maintains that the other transfers to or for the use of Mesa and the PRC Group, set forth in tables 5 and 6, increased the net worth of Mesa and the PRC Group and that "The increase in the net worth of the related legal entities was in direct proportion to the decrease in net worth of Urban and was in substance, if not in form, a direct transfer to Kean and Gray."

Respondent contends that the transfers rendered Urban insolvent and were "in fraud of both the minority shareholders of Urban and of the creditors of Urban including the federal government."

Petitioners do not dispute that Urban transferred funds to Mesa and the PRC Group and that these funds were used, in part, to pay debts guaranteed by petitioners. However, petitioners deny that the relief of their potential secondary liability on indebtedness of Mesa and the PRC Group constitutes transfers to petitioners. Petitioners do not dispute Urban's insolvency since Urban has liquidated; however, petitioners deny that the transfers occurred when Urban was insolvent. Finally, petitioners do not dispute the fact that respondent exhausted all reasonable efforts to collect the tax from Urban since Urban had liquidated; petitioners do, however, maintain that Urban's liability for the tax was not in existence at the time of the transfers because, petitioners contend, the transfers gave rise to bona fide debts owed by Mesa and the PRC Group to Urban.

We agree with respondent that Urban's transfers to pay obligations guaranteed by Kean (see table 7, *supra*) are properly treated as transfers to Kean. We agree with petitioners that (1) the remaining transfers to or on behalf of Mesa and the PRC Group are not properly treated as transfers to Kean, and (2) none of the transfers are properly treated as transfers to Gray. As to the table 7 transfers made after September 26, 1975, we agree with respondent that, under section 6901, Kean is liable as transferee for Urban's 1975 taxable year deficiency.

A number of matters must be determined in order to decide whether petitioners have the transferee liabilities that respondent determined against them in their respective notices of transferee liability.

We will consider only those matters that the parties have controverted.

## A. Transferor's Liability

We have held for respondent in issue I, *supra*, as to Urban's claims of entitlement to bad debt deductions. Petitioners have conceded the only other adjustment respondent made as to Urban. We conclude that Urban has a deficiency in income tax for its taxable year 1975. Accordingly, there is a liability for tax imposed by subtitle A, within the meaning of section 6901(a)(1)(A).

We hold for respondent on this issue.

## B. Time of Liability

Petitioners contend that they cannot be liable as transferees, for Urban's tax liability, because Urban's tax liability did not exist when the transfers were made.

We can deal summarily with this contention. It is well established that the transferee is retroactively liable for the transferor's taxes in the year of transfer and prior years, to the extent of the assets received from the transferor, even though the transferor's tax liability was unknown at the time of transfer. *Kreps v. Commissioner*, 42 T.C. 660, 670 (1964), affd. 351 F.2d 1, 10 (2d Cir. 1965). In the instant cases, we have already determined that the transfers of funds during Urban's taxable years 1975 and 1976, from

Urban to or on behalf of Mesa and the PRC Group did not give rise to bona fide indebtedness. Thus, the deductions for bad debts under section 166(a) are disallowed for Urban's taxable years 1975 and 1976 with the result that there was no loss accruing in, or to be carried back to, Urban's taxable year 1975. This conclusion results in Urban's tax liability for taxable year 1975 for which petitioners, if they are found to be transferees, may be "retroactively" liable.

We hold for respondent on this issue.

## C. Transfers of Property

The next matter for decision is whether Urban transferred property to petitioners, or either of them, within the meaning of section 6901(a)(1)(A).

Urban did not transfer property directly to petitioners. The dispute in the instant cases focusses primarily on transfers made by Urban to or for the benefit of Mesa and various entities in the PRC Group, as well as transfers made on Urban's behalf by Landfill directly to the SBA.

In the case of each of the transfers listed in table 7 as having been made in 1975, the transfer extinguished all or part of a debt owed by Mesa, PRC/Boulder, or PRC/Denver. All of these debts were guaranteed by Kean; the Mesa debts were also guaranteed by Gray.

We have long held the view that "corporate liquidating distributions paid for a stockholder's benefit or at his direction in discharge of his debt or for some other personal purpose of his should be treated as a corporate liquidating distribution *to said stockholder*, capable of forming the basis of transferee liability in him, in respect of the tax liabilities of the distributor corporation." *Fibel v. Commissioner*, 44 T.C. 647, 658 (1965). (Emphasis in original.) See generally *Gilbert v. Commissioner, supra.*

In issue I, *supra*, both sides contended, in effect, that Mesa and the PRC Group were unable to repay Urban's transfers. Indeed, Urban's 1975 tax return took the position that, by September 30, 1975, PRC/Denver and PRC/Boulder were unable to repay Urban's transfers. From this, it may fairly be concluded that, if Urban had not made the transfers to pay these debts of Mesa, PRC/Denver, and PRC/Boulder, then Kean (or Gray as an alternative, as to the

Mesa debts) would have been obligated to pay. Since Mesa, PRC/Denver, and PRC/Boulder went out of business anyway, unable to pay their debts, it does not appear that those corporations or their shareholders benefited from Urban's payments of their debts. However, if Mesa and the PRC Group had not paid their debts, then Kean (or Gray as an alternative, as to the Mesa debts) would have become liable on their guarantees. The transfers by Urban avoided this liability and thus provided direct benefits to Kean and (as an alternative, as to the Mesa debts) Gray. *Wortham Machinery Co. v. United States,* 521 F.2d at 164; *Cox v. Commissioner,* 56 T.C. 1270 (1971), supplemented by 58 T.C. 105 (1972).

Kean was Urban's president and owned 54 percent of Urban's stock. By virtue of his own direct ownership, Kean also controlled Mesa and each of the entities comprising the PRC Group (except Properties, which Kean indirectly controlled through his ownership interest in PRC). See table 1, *supra.* Thus, Kean controlled the transferor and each of the ostensible transferees. Kean directly benefited from the table 7 transfers. We conclude that the 1975 table 7 transfers were transfers of property from Urban to Kean, within the meaning of section 6901(a)(1)(A).

As table 1 shows, Gray did not have enough of an ownership interest in any of these entities to carry the day, either by himself or together with other shareholders (or partners), in opposition to Kean's determinations. Gray does not appear to have benefited at all from Urban's transfers as to PRC/Boulder and PRC/Denver. Gray's benefit from Urban's transfers as to Mesa appear to be incidental to Kean's benefit. We conclude that the 1975 table 7 transfers were not transfers of property from Urban to Gray, within the meaning of section 6901(a)(1)(A).

The parties have stipulated, and we have found (see text at table 4, *supra*), that Kean instructed the trustee to make the October 1976 $2,000 payment to the SBA. Again, Kean benefited as guarantor, and Gray's similar benefit merely was a consequence of Kean's benefit. We conclude that the same is true as to the 1979 and 1981 payments to the SBA.

Thus, as to all the payments listed in table 7, Kean controlled the payor and benefited as guarantor; as to those

where Gray benefited, Gray did not control the payor and Gray's benefit merely was a consequence of Kean's benefit. Urban transferred property to Kean; Urban did not transfer property to Gray.

Respondent contends that Kean and Gray benefited also from all the other transfers shown in tables 5 and 6 (i.e., including those that were not guaranteed by either petitioner), because they were owners of the payee entities. However, in light of the imminent demise of Mesa and the PRC Group, it might be argued that Urban's payments were of little more significance—for purposes of the instant cases[41]—than the proverbial rearrangement of the deck chairs on the Titanic. As a result, we conclude that petitioners did not actually receive direct benefits from these other transfers. See *Laure v. Commissioner*, 70 T.C. 1087, 1107-1108 (1978), revd. on another issue 653 F.2d 253 (6th Cir. 1981). In any event, whether or not Kean directly benefited from these specific other transfers, the amount of the transfers by Urban that Kean clearly benefited from (because of the relief from his guarantees) far exceeds the amount of the transferee liability that respondent has determined against Kean. Consequently, the result would not be different as to Kean even if we were to agree with respondent's contentions. See *Segura v. Commissioner*, 77 T.C. 734, 743 n. 17 (1981). As to Gray, our previous conclusion applies to these transfers as well—Gray did not control Urban and his benefit, if any, merely was a consequence of Kean's benefit.

Petitioners contend that they should not be deemed to have received transfers from Urban because none of Urban's assets were actually transferred to them or constructively transferred to them. In other words, they claim, because petitioners were merely relieved of their potential secondary liability on debts owed by Mesa and the PRC Group, claims for the payment of which had not yet been asserted against petitioners by third-party creditors, nothing was construc-

---

[41]It must be noted that the instant cases do not deal with petitioners' liabilities for their own income taxes. See *Segura v. Commissioner*, 77 T.C. 734, 746-747 (1981). It might be that any inclusions in petitioners' income could be offset, in whole or in part, by deductions for bad debts or worthless securities. See *Wortham Machinery Co. v. United States*, 521 F.2d at 164; *Tennessee Securities, Inc. v. Commissioner*, 674 F.2d 570, 574-576 (6th Cir. 1982), affg. T.C. Memo. 1978-434. See also note 20, *supra*. In the instant cases, we need not—and do not—make any determinations on those matters.

tively transferred to them. Petitioners rely on *Schwartz v. Commissioner*, 69 T.C. 877 (1978). However, in *Schwartz*, we indicated that there may be situations where transferee liability could be imposed when a transfer of funds between two related corporations relieves a common shareholder from paying on his or her guarantee of the transferee corporation's debts.

*Schwartz* involved six corporations which were controlled by the taxpayer. The corporations separately filed voluntary petitions in bankruptcy, which petitions were later consolidated by the bankruptcy court. The debtor corporations sold the bulk of their assets to an unrelated party. Respondent contended that the taxpayer was a transferee because the taxpayer received a constructive dividend when the sale proceeds relating to some of the corporations were used to satisfy other corporations' liabilities that the taxpayer had personally guaranteed.

In holding that the taxpayer was liable as a transferee only to the extent of the amount that he actually received in liquidation and that no constructive dividend resulted to the taxpayer in *Schwartz*, we first noted as follows (69 T.C. at 884-885):

It is well established that transfers between related corporations can result in constructive dividends to their common shareholders. * * * However, common ownership alone is not sufficient to justify treating intercorporate transfers as constructive dividends; the expenditures must be for the shareholder's personal benefit, and such benefit must be more than incidental. * * * *Payments made by one corporation to satisfy a debt of another corporation personally guaranteed by a shareholder of the former can, under certain circumstances, be a sufficient benefit to the shareholder if the debtor corporation would otherwise default on its obligation. Wortham Machinery Co. v. United States,* 521 F.2d 160, 164 (10th Cir. 1975); *Cox v. Commissioner,* 56 T.C. 1270[,] 1280 (1971). * * * [Emphasis added.]

We noted in *Schwartz* that, because of the consolidation of the various bankruptcy proceedings, it was appropriate in that instance for the assets of one corporation to be used to satisfy liabilities of a related corporation (69 T.C. at 886-887).

In short, as we view the circumstances herein, the sale of the corporate assets was an instrument of the chapter XI arrangement and not vice versa, as respondent contends. As a consequence, we are satisfied that

the use of excess assets of some of the corporations to satisfy the excess liabilities of other insolvent corporations was bottomed on substantial business considerations with any resulting benefit to petitioner merely incidental thereto. * * *

Nor are we convinced that a different conclusion should obtain because some of the proceeds of the sale were used to pay creditors whose claims, in the aggregate amount of $212,414.96, had been personally guaranteed by petitioner. In the first place, those creditors were in any event entitled to have 50 percent of their claims satisfied under the arrangement, as were those general creditors whose claims were not so guaranteed. Our conclusion that the use of the proceeds of sale to satisfy the claims of the latter category of creditors was sufficiently permeated with a business purpose to avoid the constructive dividend taint to that extent disposes of the issue of benefit to petitioner. * * * [Fn. ref. omitted.]

Our analysis in *Schwartz* is consistent with those in *Cox v. Commissioner, supra,* and *Wilkof v. Commissioner,* 636 F.2d 1139 (6th Cir. 1981), affg. a Memorandum Opinion of this Court.[42] Although neither of the latter two cases involved the question of the shareholder's transferee liability under section 6901, these cases are factually similar to the instant cases in that they involve transfers of corporate assets between related corporations where the transferee corporation used the transferred funds to pay its liabilities that were guaranteed by common shareholders.

In *Cox,* we held that the shareholder who controlled both transferor and transferee received a constructive dividend to the extent that the amount transferred was used to satisfy a loan guaranteed by the taxpayer because (1) the transferee corporation was insolvent and would not have been able to pay the debt absent the transfer of funds, (2) the shareholder was thereby relieved of his liability to pay in accordance with his guarantee, and (3) there was no business purpose for the transfers (56 T.C. at 1280):

Respondent has shown that as of July 31, 1965, C & D [the transferee] was insolvent * * * Thus, we conclude that C & D was unable to pay its debt and would have been forced to default if Commonwealth [the transferor] had not given it funds to pay its bank note.

\*        \*        \*        \*        \*        \*        \*

In view of our finding that the transaction in 1961 did not create a legal obligation on the part of Commonwealth to repay C & D, we cannot discern—and petitioners do not supply—any valid business purpose for

---

[42]T.C. Memo. 1978-496.

the transfers in 1966. In our judgment the transfers were caused by S.E. Copple in order to avoid liability on his endorsement. Such corporate discharge of the personal liability of a shareholder is a dividend to the extent of the corporation's (Commonwealth's) earnings and profits.

[Fn. ref. omitted; citations omitted.]

We held that others who were shareholders in both corporations did not receive constructive dividends.

*Wilkof v. Commissioner, supra,* is even more similar to the instant cases because there we held first that the intercorporate transfers did not constitute bona fide indebtedness since there was no expectation of repayment and there was a failure to comply with formalities normally associated with indebtedness. We then stated in T.C. Memo. 1978-496, affd. 636 F.2d 1139 (6th Cir. 1981), as follows (37 T.C.M. at 1851-40; 47 P-H Memo T.C. par. 78,496 at 2082-78, 2083-78):

Although TWM [the transferee] was not in default on the obligation, the payment of $240,000 of the then outstanding obligation of $320,000 owed United resulted in the removal of $240,000 of potential recourse against petitioners' personal assets. We think this constitutes a sufficient direct benefit to petitioners. See *Cox v. Commissioner,* 56 T.C. 1270 (1971). * * *

In view of * * * the subsequent relief of personal liability on TWM's obligation to United * * *, we hold that the transfer * * * directly benefited petitioners and therefore constitutes a constructive dividend.

The Court of Appeals affirmed, stating that "the decision of the Tax Court is correct for the reasons stated in its opinion." *Wilkof v. Commissioner,* 636 F.2d at 1140.

We believe that because the facts of the instant cases are more closely analogous to those of *Cox* and *Wilkof,* the conclusions reached therein should be applied here too. That is, when Urban made the transfers, the operations of Mesa and the PRC Group had been virtually shut down. To the extent there were any operations continuing at all, they resulted in losses to the companies. Moreover, as previously noted, Mesa and the PRC Group had been experiencing significant losses for some time before the transfers were made. (See tables 2 and 3, *supra.*) Thus, there was a substantial likelihood that Mesa and the PRC Group would default on their Kean-guaranteed debts, absent the transfers

by Urban to pay these debts, and therefore the transfers that Urban made directly benefited Kean.

We conclude that, within the meaning of section 6901(a)(1)(A), Urban transferred property to Kean in amounts (the table 7 amounts) the aggregate of which exceed the amount of the transferee liability that respondent determined against Kean; and that Urban did not transfer property to Gray.

We hold for respondent as to Kean, and for petitioners as to Gray, on this issue.

### D. State Law

Finally, we must decide whether, under Colorado law, respondent would be able to collect Urban's tax liability from Kean because of Urban's transfers to Kean. *Commissioner v. Stern,* 357 U.S. at 42-45; *United States v. Floersch,* 276 F.2d 714, 717 (10th Cir. 1960).

Respondent asserts[43] that Kean is liable as a transferee of Urban under Colo. Rev. Stat. sec. 7-5-114(1)(c) (repl. vol. 1986) (hereinafter sometimes referred to as the dissolution statute).[44]

Petitioners contend that the dissolution statute does not result in transferee liability because (1) petitioners (as shareholders) did not receive any "actual dividend or liquidating distributions from Urban", (2) respondent has failed to show that petitioners failed to provide for Urban's

---

[43]Respondent also contends that Kean is liable under "the fraudulent conveyance statute", Colo. Rev. Stat. sec. 38-10-117 (repl. vol. 1982). In light of our determination under Colo. Rev. Stat. 7-5-114, we do not consider the applicability of the fraudulent conveyance statute.

[44]Both parties appear to have set forth in brief the text of Colo. Rev. Stat. sec. 7-5-114 as amended by the 1981 Colo. Sess. Laws sec. 26 passed by the 53d General Assembly of the State of Colorado. In 1981, the General Assembly of the State of Colorado repealed and reenacted, with amendments, the 1973 version of Colo. Rev. Stat. sec. 7-5-114, with an effective date of Jan. 1, 1982. Since the transfers made by Urban and Urban's liquidation occurred before Jan. 1, 1982, we will apply the 1973 version of Colo. Rev. Stat. sec. 7-5-114, as it appeared before the 1981 changes. Colo. Rev. Stat. sec. 7-5-114, as in effect for 1973 provided, in part, as follows:

7-5-114. Liability of directors in certain cases. * * *

(3) The directors of a corporation who vote for or assent to any distribution of assets of a corporation to its shareholders during the liquidation of the corporation without the payment and discharge of, or making adequate provision for, all *known* debts, obligations, and liabilities of the corporation shall be jointly and severally liable to the corporation for the value of such assets which are distributed, to the extent that such debts, obligations, and liabilities of the corporation are not thereafter paid and discharged. [Emphasis supplied.]

We note that the 1973 version of Colo. Rev. Stat. sec. 7-5-114 appears to be substantively similar to the 1981 version.

creditors,[45] and (3) any income tax liability of Urban was not a "known" liability.

The provisions of the Colorado Corporation Code, and especially Colo. Rev. Stat. sec. 7-5-114(3) and not the "trust fund doctrine", govern the liabilities of a corporation's directors when the corporation dissolves. *Ficor, Inc. v. McHugh,* 639 P.2d 385, 391-392 (Colo. 1982).[46] Also, when a corporation distributes its assets in violation of the dissolution statute, a stockholder who receives the assets is liable under both equitable considerations and the dissolution statute (Colo. Rev. Stat. sec. 7-5-114(7), predecessor of Colo. Rev. Stat. sec. 7-5-2) to the extent of the value of the assets received. *Ficor, Inc. v. McHugh,* 639 P.2d at 395.

The purpose of the dissolution statute is the protection of creditors. Accordingly, even though the statute makes each director "liable to the corporation" and not in terms liable to the corporation's creditors, the Colorado Supreme Court has held that all creditors of a corporation, as a group, may assert the dissolution statute on behalf of a corporation for their own benefit. *Ficor, Inc. v. McHugh,* 639 P.2d at 393.

---

[45]We note that petitioners have not argued that the transfers made by Urban to Mesa and the PRC group were made for the purpose of repaying loans made by petitioners to Urban and petitioners have not argued that such a preference in repayment over other creditors is allowable under Colorado law. (Also, petitioners have not directed our attention to any Colorado cases or statutes which would support such a preference in repayment over other creditors.) Rather, petitioners adamantly contend that the loans that petitioners made to Urban were never repaid, and that the transfers by Urban were bona fide business loans to Mesa and the PRC group.

[46]As counsel for both sides have noted, in *Commercial Finance Co. v. Commissioner,* T.C. Memo. 1968-229, we concluded that the courts of Colorado would apply the "trust fund doctrine" in determining liabilities of a director of a dissolved corporation. Later, however, in *Ficor, Inc. v. McHugh,* 639 P.2d 385, 391-392 (Colo. 1982), the Supreme Court of Colorado described the situation as follows:

"The trial court concluded that the directors of a corporation which is being liquidated are trustees for the creditors of the corporation and are personally liable to those creditors if they take corporate property for their own benefit rather than making provision for the payment of creditors. In reaching this conclusion the trial court relied on *Crowley v. Green,* 148 Colo. 142, 365 P.2d 230 (1961); *Rosebud Corp. v. Boggio,* 39 Colo. App. 84, 561 P.2d 367 (1977); and *Epcon Co. v. Bar-B-Que Baron International Inc.,* 32 Colo. App. 393, 512 P.2d 646 (1973). *Accord, Gaskins v. Bonfils,* 79 F.2d 352 (10th Cir. 1935); 19 C.J.S., Corporations, §§ 1391. In affirming the judgment, the court of appeals relied instead on sections 7-8-105 and 7-5-114(3), C.R.S. 1973, which define a corporation's duties and directors' obligations incident to corporate dissolution. We conclude that the court of appeals was correct in holding that these statutes control the disposition of this case."

In determining what Colorado law is, we, of course, follow the Colorado Supreme Court's exposition of that law. See *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465 (1967); *Estate of Sawyer v. Commissioner,* 73 T.C. 1, 3 (1979). In view of the intervening Colorado Supreme Court decision, we will not apply the trust fund doctrine in determining transferee liability under the circumstances of the instant cases.

Where only one creditor is known, that creditor may bring the action on his, her, or its own behalf, without purporting to sue on behalf of all creditors. See *Delgado Oil Co. v. Torres,* 785 F.2d 857, 861 (10th Cir. 1986). The record in the instant cases does not disclose the existence of any other creditor whose interests would be harmed by respondent's prosecution of its claim under the dissolution statute.[47]

Kean owned 54 percent of Urban's stock and was its president and a director. Table 1, *supra.* We have held that Urban transferred property to Kean in amounts the aggregate of which exceed Urban's tax deficiency liability. We conclude that Kean could be sued by respondent under the dissolution statute.[48]

However, as the Colorado Supreme Court noted, the dissolution statute is limited to *known* debts, obligations, and liabilities. *Ficor, Inc. v. McHugh,* 639 P.2d at 392 n. 12, distinguishing the Colorado statute from the otherwise substantially identical District of Columbia statute, which is not so limited. The issues in *Ficor, Inc. v. McHugh* did not turn on whether debts were known, and so the Colorado Supreme Court did not use that opinion to lay down guidelines. The parties have not pointed us to, and we have not found, authoritative Colorado analyses of the term "known debts" in the Colorado dissolution statute, and so we have searched elsewhere.

In *Neill v. Phinney,* 245 F.2d 645 (5th Cir. 1957), the Court of Appeals for the Fifth Circuit faced a similar issue of interpreting the term "known debts" under Oklahoma corporate dissolution statutes, also in the context of transferee liability under the Internal Revenue Code. In *Neill,* the stockholders and directors of a corporation adopted a plan of dissolution on December 1, 1950. 245 F.2d at 648. The

---

[47]We note that petitioners have not contended that their status as creditors of Urban prevents respondent from prosecuting its claim under the dissolution statute. We, therefore, express no opinion on this issue and address only those matters as controverted by the parties. See *Estate of Fusz v. Commissioner,* 46 T.C. 214, 215 n. 2 (1966).

[48]Gray also was a shareholder and director of Urban. Table 1, *supra.* However, in order for Gray to be a transferee under sec. 6901, Urban must have transferred property to Gray. We have held that Urban did not transfer property to Gray, within the meaning of sec. 6901(a)(1)(A). There is no suggestion that Gray may be a transferee of a transferee. Accordingly, there can be no transferee liability against Gray, under sec. 6901, even if Gray would be liable under the dissolution statute. We make no determination as to whether Kean would be entitled to contribution from Gray under Colo. Rev. Stat. sec. 7-5-114(3) (or its predecessor, Colo. Rev. Stat. sec. 7-5-114(8)).

plan of dissolution contemplated payment of the corporation's "debts known or likely to accrue". 245 F.2d at 648-649. The Excess Profits Tax Act of 1950 was enacted on January 3, 1951, and was made applicable to taxable years ending after June 30, 1950. 64 Stat. 1137.[49] On December 13, 1950, after the plan of dissolution was adopted and before the Excess Profits Tax Act of 1950 was enacted, the corporation made distributions to its shareholders and retained enough assets to satisfy all its corporate debts including an estimate of corporate tax liability; however, a provision was not made for any probable excess profits tax. 245 F.2d at 648-649. The corporation paid its debts over a period of time extending through April 27, 1951. 245 F.2d at 651.

The shareholders paid the corporation's excess profits tax and then sued for refund, claiming (1) that the corporation had dissolved early enough so that it did not have any excess profits tax liability and (2) that in any event the shareholders did not have transferee liabilities for any excess profits tax liability of the corporation.

The Court of Appeals held that the corporation was liable for the excess profits tax, and then considered the shareholders' transferee liabilities. Oklahoma's dissolution statute provided as follows:

> After determining that all the known debts and liabilities of a domestic corporation, in the process of winding up, have been paid or adequately provided for, the directors shall distribute all the remaining corporate assets among the shareholders and owners of shares according to their respective rights and preferences. [245 F.2d at 652 n. 12.]

In applying the foregoing statute, the Court of Appeals stated:

> At the time the distribution was ordered December 13, 1950, the corporation knew it would have to represent that all liabilities *then* known were paid or provided for. As businessmen, the Directors were bound to know that some character of excess profits tax undoubtedly would be enacted and that, at the time the application for dissolution would thereafter be presented, that nature of that tax would be known and the amounts due thereunder either established or ascertainable. They could not, in ostrich-like indifference to the facts of modern life ignore

---

[49]The Revenue Act of 1950, enacted on Sept. 23, 1950, had directed the Congress' tax-writing committees to promptly report an excess profits tax bill "with retroactive effect to Oct. 1, or July 1, 1950". 64 Stat. 906, 967.

this almost positive certainty * * * [245 F.2d at 653; emphasis in original.]

The Court of Appeals held that the directors did not make an adequate provision for the excess profits tax and imposed transferee liability for this tax on each of the stockholder transferees of the dissolved corporation. 245 F.2d at 653.

In the instant cases, respondent seeks to collect from Kean $34,032 for Urban's 1975 corporate tax liability. On September 26, 1975, Urban adopted a plan of complete liquidation which provided for the distribution of corporate assets after the payment of corporate debts. In March 1976, after the payment of certain debts, Urban liquidated and assigned its remaining assets to the trust. On or about February 27, 1977, Urban filed its tax returns for its taxable years 1975 and 1976. Urban deducted on its 1975 tax return some of the transfers it made to Mesa and the PRC group even though, under the interpretation most favorable to Urban, these deductions should not have been taken until Urban's 1976 tax return, with carrybacks to 1974 and 1975. See note 2, *supra*. Thus, it is apparent that Urban had a known tax liability for 1975 which was not provided for and was not paid. Once it has been shown that a known debt was not provided for, then the dissolution statute extends the director "liability to debts that go unpaid for any reason." *Ficor, Inc. v. McHugh,* 639 P.2d at 395.

The dissolution statute imposed upon Kean, as director and president of Urban, the duty to make an adequate provision for all known debts. Kean's obligation arose on September 26, 1975, the date the plan of liquidation was adopted. Transfers made by Urban after September 26, 1975, could only be made after Urban's known debts were paid or provided for. Kean was bound to know that Urban may have accrued a tax liability for its 1975 taxable year. In fact, Urban's books and records through September 30, 1975, would have revealed a tax liability for 1975. Kean, instead, caused Urban to make the transfers without providing an adequate provision to satisfy the 1975 tax liability. Kean's disregard of the 1975 tax liability is apparent from the fact that the 1975 and 1976 tax returns

were not prepared and filed until after the transfers were made and Urban's liquidation completed. We conclude that the transfers made after September 26, 1975, were made without providing an adequate provision for all known debts as required under the dissolution statute. As appears from table 7, *supra*, the amount of Urban's post-September 26, 1975, transfers to Kean exceeds the amount of Urban's tax deficiency. We conclude that Kean, as director and president of Urban, by causing such transfers, is liable under the corporate dissolution statute and is liable as a stockholder and transferee for Urban's unsatisfied 1975 tax liability.

Finally, although petitioners have conceded that Urban may have been rendered insolvent by virtue of the liquidating distributions, petitioners contend that no transfers within the meaning of section 6901 have occurred. We have held that Urban did transfer property to Kean within the meaning of section 6901. Thus, the transfers made after Urban adopted its plan of liquidation were among a series of distributions in liquidation which resulted in Urban's insolvency.

We hold for respondent as to Kean's transferee liability; we hold for petitioners as to Gray's transferee liability.

> *Decision will be entered for the respondent in docket No. 19346-81; decision will be entered for the petitioner in docket No. 19347-81.*