T.C. Memo. 1996-273

UNITED STATES TAX COURT

BILLIE AND FLORENCE LYKINS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21868-94.                    Filed June 12, 1996.

Joseph L. Rosenbaum, for petitioners.

Paul J. Krazeise, Jr., for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

ARMEN, Special Trial Judge:  This case was assigned pursuant
to the provisions of section 7443A(b)(3) and Rules 180, 181, and
182.[1]

Respondent determined a deficiency in petitioners' Federal
income tax for the taxable year 1990 in the amount of $6,169.

_____

[1] Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the taxable year in
issue, and all Rule references are to the Tax Court Rules of
Practice and Procedure.

After concessions by the parties, the issues remaining for decision are: (1) Whether an advance by petitioner Billie Lykins to Tag Coal Corp. was a loan or a capital contribution; and, if the advance was a loan, (2) whether such advance was a "business" or a "nonbusiness" debt within the meaning of section 166.

Some of the facts have been stipulated, and they are so found. Petitioners resided in Versailles, Kentucky, at the time that their petition was filed with the Court.

FINDINGS OF FACT

Petitioner Billie Lykins (petitioner) grew up in eastern Kentucky and has lived there for most of his life. Petitioner worked for the Kentucky State Police for 26 years until he retired in 1976. After retiring from the State Police, petitioner spent a few months doing contract work for coal companies and then was appointed the U.S. Marshall for the Eastern District of Kentucky.

In or about 1981, after resigning his appointment as a marshall, petitioner began working for Coal Mack, a coal company. Petitioner was in charge of the overall operations of the coal company, including production, transportation, leasing, and settling labor disputes.

Petitioner was very familiar with the coal mining industry in eastern Kentucky and contemplated starting his own coal-related business. Petitioner frequently talked with Michael Templeman (Mr. Templeman), his stepson, about his desire to enter

a coal-related business. Mr. Templeman is petitioner Florence Lykins' (Mrs. Lykins) son.

Mr. Templeman and John Adkins (Mr. Adkins) were sole, equal partners in J & M Equipment Co. (J & M), a partnership engaged in the business of leasing, as lessor, heavy machinery used for grading and excavating property connected with construction projects and coal mining. The record does not clearly indicate the specific amount of J & M's outstanding liabilities; however, it appears that J & M had outstanding liabilities of approximately $700,000.

Mr. Templeman and Mr. Adkins were also sole, equal shareholders in Tag Coal Corp. (Tag Coal), a corporation that performed grading and excavation services for construction projects located in eastern Kentucky. Tag Coal leased equipment from J & M in order to conduct its business. Tag Coal was the primary lessee and customer of J & M.

In August 1984, Tag Coal was performing general excavation work for Commonwealth Development Corp. (Commonwealth). Although Tag Coal was ultimately liable for employment taxes incurred in connection with the excavation work, the terms of the contract between Commonwealth and Tag Coal required Commonwealth to pay the employment taxes incurred by Tag Coal. However, before the project was completed, Commonwealth filed for bankruptcy and failed to pay $175,970.51 in employment taxes owed by Tag Coal. Commonwealth also failed to pay approximately $1,000,000 in other

payments due Tag Coal under the parties' contract. Tag Coal filed mechanic's liens in an effort to collect these amounts.

The Commissioner notified Mr. Templeman and Mr. Adkins that if Tag Coal did not pay its employment tax liability, then the Internal Revenue Service (IRS) would proceed to collect such liability from J & M and its assets.[2]

Sometime prior to August 27, 1984, Mr. Adkins indicated that he wanted to withdraw as a partner from J & M. Mr. Adkins and Mr. Templeman discussed the possibility of Mr. Templeman's buying Mr. Adkins' interest in the partnership. Mr. Templeman also discussed the situation with petitioner. Petitioner expressed an interest in purchasing Mr. Adkins' partnership interest. At some point prior to August 30, 1984, petitioner and Mr. Templeman orally agreed to become equal partners in J & M.

On August 27, 1984, Mr. Adkins agreed to transfer his 50-percent partnership interest in J & M to Mr. Templeman. In exchange, Mr. Templeman agreed, inter alia: (1) To assume and pay all delinquent taxes by August 30, 1984, and (2) to relieve Mr. Adkins of all liabilities relative to both J & M and Tag Coal. Although an agreement was executed, it was never consummated and was effectively abrogated by the parties.

---

[2] As responsible officers of Tag Coal, Mr. Templeman and Mr. Adkins would be liable for the 100-percent penalty under sec. 6672, and the IRS was of the view that their personal assets, including their partnership interests in J & M, would be subject to distraint.

Mr. Adkins did not contemplate transferring, nor did he ever transfer, any interest in Tag Coal to either Mr. Templeman or petitioner. Mr. Adkins retained his interest in Tag Coal because he hoped that Tag Coal could recover the substantial amounts owed to it by Commonwealth.

On August 30, 1984, petitioner issued a check in the amount of $175,970.51 to Tag Coal for the purpose of permitting Tag Coal to pay its outstanding employment tax liability. The memo entry at the bottom of the check reads "Loan to Tag Coal Corp." The amount advanced by petitioner was recorded as a loan payable on Tag Coal's corporate books. Tag Coal used the proceeds from the check to pay its employment tax liability. In a document styled "Agreement" dated August 30, 1984, Mr. Adkins and Mr. Templeman granted petitioner a "judgement without protest" against Tag Coal for a "loan made to Tag Coal".

Petitioner considered himself to be an equal partner in J & M on August 30, 1984; however, he did not terminate his employment with Coal Mack at that time because Coal Mack had not yet hired his successor. Petitioner did not want to leave Coal Mack until his position had been filled. Thus, on August 30, 1984, petitioner was employed by Coal Mack and was simultaneously performing services for J & M. Specifically, petitioner negotiated contracts for J & M and supplied the contractors with J & M's equipment.

On October 1, 1984, Mr. Adkins, Mr. Templeman, and petitioner executed a contract in which Mr. Adkins agreed to transfer his 50-percent partnership interest in J & M to petitioner. In exchange, petitioner agreed to assume and pay all of Mr. Adkins' share of J & M's outstanding liabilities. Prior to October 1, 1984, petitioner and Mr. Templeman had applied for and received a $700,000 loan in order to satisfy J & M's outstanding liabilities.

Sometime before October 1, 1984, Mr. Adkins developed severe heart problems. Mr. Adkins' medical condition prevented him from executing the October 1, 1984, agreement on an earlier date.

Sometime in 1985, Tag Coal paid petitioner $44,806.72 against the amount advanced by petitioner on August 30, 1984.

Tag Coal was ultimately unsuccessful in recovering the substantial payments owed to it under its contract with Commonwealth. Consequently, on September 11, 1989, Tag Coal filed a petition for bankruptcy under chapter 7 with the bankruptcy court for the Eastern District of Kentucky. At the time that the petition was filed, Tag Coal owed petitioner $131,163.79 in respect of the amount advanced by petitioner on August 30, 1984.

On an amended income tax return (Form 1040X) for 1989, petitioners claimed that the amount advanced to Tag Coal and not repaid; i.e. $131,163.79, was a business bad debt. On an amended income tax return (Form 1040X) for 1990, petitioners claimed a

net operating loss (NOL) carryover from 1989. A substantial portion of the carryover was attributable to the business bad debt deduction claimed by petitioners on Form 1040X for 1989.

OPINION

In 1990, petitioners claimed an NOL carryover stemming from a business bad debt deduction reported on Form 1040X for 1989. At issue in this case is the deductibility of the carryover claimed by petitioner. The resolution of this issue turns on whether the advance made by petitioner to Tag Coal on August 30, 1984, was a loan or a capital contribution, and, if the payment was a loan, whether it was a business or a nonbusiness loan. We address these issues in turn.

1.   Capital contribution issue

Section 166 allows a deduction for any bad debt that becomes worthless during the taxable year. A bona fide debt is a debt that arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. Sec. 1.166-1(c), Income Tax Regs. This is in contrast to a contribution to capital or equity investment, which is not considered debt for purposes of section 166. Kean v. Commissioner, 91 T.C. 575, 594 (1988); sec. 1.166-1(c), Income Tax Regs.

The existence of a bona fide debt is a factual inquiry that turns on the facts and circumstances of the particular case, and the taxpayer bears the burden of proving that a bona fide debt

existed.  Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980); Litton Business Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973).  Factors considered in determining whether an amount advanced is a loan or a capital contribution include: the intent of the parties; the names given to the written instruments evidencing the advance; the failure of the party receiving the advance to repay; the right to enforce repayment; the presence or absence of a fixed maturity date; participation in management as a result of the advance; and the risk involved in making the advance.  Dixie Dairies Corp. v. Commissioner, supra.  No single factor is decisive, and, due to the myriad of circumstances in which this issue can arise, some of the factors may not be relevant in a particular case.  Id.

Respondent contends that petitioner's advance to Tag Coal on August 30, 1984, was a capital contribution and not a loan. Respondent does not apply the foregoing factors to reach her conclusion; rather, respondent argues that the August 27 and October 1, 1984 agreements prove that petitioner paid, in part, $175,970.51 in exchange for his 50-percent partnership interest in J & M.

We note that the following events occurred somewhat contemporaneously:  petitioner advanced $175,970.51 to Tag Coal to satisfy its outstanding employment tax liability; petitioner received a 50-percent partnership interest in J & M; and petitioner applied for and received a $700,000 loan intended to

satisfy J & M's other outstanding liabilities. Apparently, respondent interprets the contemporaneity of these events to support her contention. However, we draw no such inference from the timing of these events. Rather, we think that petitioner, in two contemporaneous but separate transactions, assumed approximately $700,000 of liabilities in exchange for his interest in J & M and made a loan to Tag Coal. We reach this conclusion by applying the above mentioned factors to the facts of this case.

First, the parties genuinely intended the amount advanced by petitioner to be a loan. Petitioner and Mr. Templeman both testified at trial that they considered the advance to be a loan. We found petitioner and Mr. Templeman to be credible witnesses, and we have no reason to question their veracity.

Second, the parties' intent is confirmed by written instruments characterizing the advance as a loan. For example, in a document styled "Agreement" dated August 30, 1984, the amount advanced by petitioner is referred to as a "loan made to Tag Coal Corporation for delinquent taxes in the amount of $175,970.51." Additionally, petitioner referred to the payment as a loan on the memo line of the check issued to Tag Coal. Finally, the advance was recorded as a loan on Tag Coal's corporate books.

Third, within approximately one year after the advance, Tag Coal repaid petitioner $44,806.72 of the $175,970.51 advanced.

There is nothing in the record to suggest that petitioner's 50-percent partnership interest in J & M decreased or was otherwise affected by such repayment. This is compelling evidence that the advance to Tag Coal was not tied to an equity interest in J & M, and that the advance was a loan as opposed to a capital contribution.

Fourth, Tag Coal's failure to repay $131,163.79 of the amount advanced was not voluntary. The outstanding debt became worthless only because Tag Coal was forced to declare bankruptcy after Commonwealth defaulted on its contract. We have no reason to think that Tag Coal would not have repaid the outstanding loan if Tag Coal had remained solvent. Moreover, there is no indication in the record, nor does respondent contend, that petitioner could have foreseen that Tag Coal would become insolvent. In sum, petitioner reasonably believed that Tag Coal could and would repay the loan.

Petitioner's genuine intent to create a debtor-creditor relationship, the reasonable expectation of repayment, and the absence of any change in petitioner's equity interest in J & M upon repayment by Tag Coal lead us to conclude that the advance by petitioner to Tag Coal was a loan and not a capital contribution. Accordingly, we decide this issue for petitioners.

2.  Business versus nonbusiness bad debt

We must next decide whether petitioner's loan to Tag Coal was a business or a nonbusiness debt within the meaning of section 166.

As previously mentioned, section 166 allows a deduction for any bad debt that becomes worthless during the taxable year.[3] Business bad debts are fully deductible from ordinary income; however, nonbusiness bad debts of taxpayers other than corporations are treated as short-term capital losses. Sec. 166(d)(1). A nonbusiness bad debt is defined as a debt other than "(A) a debt created or acquired * * * in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business." Sec. 166(d)(2).

The question of whether a debt is a business or nonbusiness debt is essentially a question of fact, the resolution of which depends upon whether the debt is "proximately" related to the trade or business of the taxpayer. Sec. 1.166-5(b), Income Tax Regs. A proximate business relationship exists only if the taxpayer's dominant motivation in making the loan was for business reasons. United States v. Generes, 405 U.S. 93 (1972). Thus, in order to receive the favorable tax treatment afforded to business bad debts, petitioner must prove that he was engaged in

_____

[3] Respondent does not dispute that the advance, if it was a debt, as we have so held, became worthless in 1989.

a trade or business, and that the worthless debt was proximately related to that trade or business.

Respondent contends that the debt was not acquired or created while petitioner was in the trade or business of leasing equipment because petitioner advanced funds to Tag Coal on August 30, 1984, and did not become a partner in J & M until October 1, 1984.

It is true that the October 1, 1984, agreement was the first written instrument reflecting petitioner's 50-percent partnership interest in J & M. However, based on the record as a whole, we think that petitioner was in the trade or business of leasing equipment and was acting as a partner in J & M prior to actually executing the October 1, 1984, agreement. In this regard, the record demonstrates that petitioner and Mr. Templeman had orally agreed, no later than August 30, 1984, that they were equal partners in J & M. The intent of Mr. Templeman and petitioner to create an equal partnership before October 1, 1984, is supported by objective evidence, most significantly by the fact that petitioner was performing important services on behalf of J & M by August 30, 1984. For example, petitioner negotiated contracts for J & M and supplied J & M's equipment to the partnership's lessees.

Further, we think that the August 27, 1984, agreement, the October 1, 1984, agreement, and the discussions surrounding these agreements, represented a single effort designed to convey a 50-

percent partnership interest in J & M to petitioner. The record does not explain why Mr. Templeman and Mr. Adkins entered the August 27, 1984, agreement without petitioner; however, the testimony of petitioner and Mr. Templeman at trial indicates that a transfer of Mr. Adkins' partnership interest to petitioner was contemplated by all three parties. We have no reason to doubt their testimony. Moreover, we are satisfied that one significant reason that the August 27, 1984, agreement was not amended earlier was because of Mr. Adkins' medical condition and his unavailability due to his serious condition.

Respondent points out that on August 30, 1984, petitioner was employed by Coal Mack. This fact does not alter our analysis. A taxpayer can be engaged in more than one trade or business at the same time. Syracuse v. Commissioner, T.C. Memo. 1981-340. Moreover, the only reason petitioner remained employed by Coal Mack after August 30, 1984, was because Coal Mack had not yet hired his successor.

For the foregoing reasons, we conclude that petitioner was in the trade or business of leasing equipment at the time that he made the loan to Tag Coal.

Respondent also contends that petitioner's motivation for making the loan did not have a proximate relationship to petitioner's trade or business of leasing equipment. In this regard, respondent argues that petitioner's dominant motivation in making the loan was to relieve Mrs. Lykins' son, Mr.

Templeman, of his potential liability for Tag Coal's outstanding employment taxes and that the loan was thus personal in nature. Petitioner contends that this dominant motivation for making the loan was to "keep the equipment working", thereby protecting J & M's ability to lease, as lessor, such equipment to its clients.

Although petitioner's loan to Tag Coal undoubtedly benefited Mrs. Lykins' son, Mr. Templeman, we do not think that the desire to confer such benefit was the controlling factor in petitioner's decision to make a loan to Tag Coal. Rather, for the following reasons, we think that the motivation for making the loan was as articulated by petitioner and that such motivation was proximately related to his trade or business of leasing equipment.

The IRS had informed Tag Coal that if the corporation did not pay its outstanding employment tax liability, the IRS would proceed against the assets held by J & M to satisfy such liability. If petitioner had not loaned money to Tag Coal, and if the IRS had proceeded against J & M's assets; i.e. the equipment, J & M would not have had equipment to lease to its clients. This would have effectively precluded petitioner from carrying on his trade or business of leasing equipment.

In addition, Tag Coal was the primary lessee and customer of J & M. Since petitioner is a 50-percent partner in J & M, we can readily accept his testimony concerning his desire to "keep Tag afloat".

Accordingly, we conclude that petitioner's dominant motivation in making the loan to Tag Coal was to protect J & M's equipment and ultimately petitioner's ability to lease such equipment to third parties. We therefore hold that the debt owed to petitioner by Tag Coal is appropriately characterized as a business bad debt and is deductible by petitioners as such.

In order to reflect our disposition of the disputed issues, as well as the parties' concessions,

<u>Decision will be entered under Rule 155.</u>